**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**RYDER/P.I.E. NATIONWIDE, INC., Respondent.**

**No. 86–4260.**

United States Court of Appeals, Fifth Circuit.

Feb. 20, 1987.

Judith Dowd, Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., Paul Spielberg, Atty., Joseph G. Norton, Act. Dir., New Orleans, for petitioner.

John Paul Jones, Clearwater, Fla., for respondent.

Before GARWOOD, JOLLY and HILL, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Ryder/P.I.E. Nationwide, Inc. ("Ryder"), petitions this court to review and set aside an order of the National Labor Relations Board ("Board") finding that Ryder had violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 158(a)(1) and 158(a)(3) [1] by discharging Clarence Eugene Pate ("Pate") for the protected activity of filing griev-

ances. The Board's order also found Ryder in violation of section 8(a)(1) of the Act for remarks made to an employee by one of its supervisors. Ryder does not challenge this part of the Board's order. The Board cross-petitions for enforcement of its order.

Two issues are presented by this petition. The first is whether the Board acted within its discretion by declining to defer to an arbitration award upholding the discharge of the employee, Pate. The second is whether substantial evidence on the record as a whole supports the Board's finding (a) that Pate's grievance filing (a protected activity) was a motivating factor in his discharge, and (b) that Ryder failed to prove that it would have discharged him even in the absence of his protected activity. Although we find that the Board did not abuse its discretion by refusing to defer to the arbitration award, we conclude that substantial evidence does not support the Board's conclusion that Pate would not have been discharged in the absence of his protected activity. We therefore deny enforcement of that part of the Board's order requiring Ryder to reinstate Pate with back pay. We do, however, grant enforcement to that part of the Board's order finding Ryder in violation of section 8(a)(1) of the Act for remarks made by one of its supervisors, as Ryder does not challenge that finding.

I

Clarence Pate began working for Ryder in March 1977 as an over-the-road driver at its Birmingham, Alabama, terminal. In January 1983, Pate and about eight to ten other drivers were transferred to the company's New Orleans terminal. At the time of the transfer, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local Union No. 270 ("the Union") negotiated an

---

1. 29 U.S.C. § 158(a)(1) and (3) provide in part:
   It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

   . . . .
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. . . .

agreement with the company providing that the relocated drivers would be assigned to transport all freight shipments from New Orleans westward. Under the agreement, the relocated drivers could invoke the contractual grievance if the company gave such assignments ("run around trips") to drivers from other terminals.

During the period relevant to this case, Jim Christianson was an operations supervisor and Julio Magana a dock supervisor at the New Orleans terminal. Tom Davis became the terminal manager on January 27, 1984.

In late September 1983, the company apparently began to breach the run-around-trip agreement with respect to Pate. Pate complained to Union steward Billy Cullen, and Cullen spoke to company officials several times about the improper trip assignments. The company continued to bypass Pate in assigning westward runs, and he began filing grievances. Pate initiated about eight to ten grievances between October 3, 1983, and March 1984. At least six of them concerned company violations of the run-around trip agreement. All six were found to be valid and Pate collected approximately $763 in compensatory pay.

In addition to filing grievances for Pate, Cullen filed about eighteen of his own between January and March 1984. Most of Cullen's personal grievances concerned claims for no more than a few hours pay for call-in or terminal delay time. Only two alleged a claim similar to Pate's for improper company assignment of an entire freight run. Cullen apparently withdrew one of these two trip-assignment grievances prior to hearing. The remainder of his personal grievances alleged either harassment by supervisors or unsafe working conditions.

Cullen also filed about four grievances on behalf of all New Orleans drivers, protesting a new company policy limiting to one-half hour the amount of time a driver could claim for dropping loaded trailers and hooking up empty trailers at the terminals ("drop and hook time"). The company enforced its new policy by deducting from drivers' time cards any amounts claimed in excess of the time allotted, unless the driver gave a satisfactory explanation for the additional time spent. Dock supervisor Magana routinely decided whether to accept drivers' explanations for additional time claimed.

Sometime in early 1984, Cullen told Supervisor Christianson that his truck needed certain repairs and that it was unsafe to operate without the repairs being made. Christianson insisted that the truck was safe to drive and directed Cullen to take it out. During the discussion that followed, Christianson told Cullen that if he was "as conscientious about his job as he [was] about filing grievances" there wouldn't be any problems at the terminal.

Sometime in late March, Cullen was given the opportunity to transfer to the Nashville terminal, and he decided to do so. When Cullen told Supervisor Magana that he was going to transfer, Magana responded that it was the best thing Cullen could do, because if he stayed in New Orleans he "wouldn't have a job."

On April 1, 1984, at 11:55 p.m., Pate was dispatched on a regular run to the company's Thibodaux terminal and back. The trip from New Orleans usually takes from about one hour and forty-five minutes to two hours. At about 1 a.m., George Lockett, the night dockman at Thibodaux, called the New Orleans terminal and ascertained that Pate was the driver of the truck for Thibodaux and had left the terminal about midnight. At about 2 a.m., Lockett got the terminal manager, Catton, out of bed to report that Pate had not yet arrived. Catton told Lockett to call again when Pate came in. Pate arrived at the Thibodaux terminal at 3:40 a.m.

After Pate's arrival, Lockett called Catton who instructed him, as was customary in such cases, to make a copy of Pate's trip card. Lockett took Pate's trip card to duplicate it and returned the original to Pate. Lockett noted that the arrival time block on the trip card was blank and that Pate's 3:40 a.m. arrival time appeared in the departure time block. Lockett then left the copy of

the trip card on Catton's desk and went out with Pate to help him drop the loaded trailer and hook up two empty trailers for the return trip. After they returned to the terminal, Pate sat down to do his paper work, and Lockett saw Pate write in "2:00 a.m." as his arrival time on his trip card. Pate left the Thibodaux terminal at 4:16 a.m. for the return trip to New Orleans.

Later in the morning, Catton called New Orleans terminal manager Davis to complain about Pate's late arrival. That same day Catton prepared a written statement of the facts concerning Pate's late arrival and employee Lockett signed it. Catton sent this memo, a copy of Pate's trip card, and copies of the sign-in and sign-out sheets to Davis a few days after the incident.

After Pate returned to New Orleans, he submitted his trip card to the company for payment for the Thibodaux run. Pate claimed an hour and one-half drop and hook time at the Thibodaux terminal. Thereafter, Pate continued to drive freight as usual.

About April 6 or 7, Supervisor Magana heard that company officials suspected Pate of some misconduct. On the afternoon of April 8 when Magana was driving to work, he observed Pate entering his truck which was parked outside a convenience store. Magana checked records when he arrived at the terminal and found that Pate had been sent to Lafayette. Magana later obtained a copy of Pate's log sheet and found that Pate had claimed he was driving at the time Magana observed him at the convenience store. On April 12, Magana issued a warning letter to Pate for falsifying his log sheets.

On April 25, Davis summoned Pate to his office and gave him a termination notice which stated, in pertinent part:

> On Monday, April 2, 1984 you claimed and were paid for 1.6 hours [one hour and 36 minutes] drop and hook time at the Thibodaux, LA Terminal.... In fact

you were only delayed .5 hours [one-half hour]. This is to advise you that you are hereby discharged for dishonesty under article 45 section 1 of the current National Master Freight Agreement....

The difference between the pay claim Pate submitted for April 2, and the amount which the company calculated he was actually owed was $14.28.

About the time of Pate's discharge, employee Kenneth Jordan asked Supervisor Magana what had happened to Pate. Magana replied that "his grievances got him," and then he laughed.

Pate filed a grievance concerning his discharge, which the company rejected at the initial stage. On May 21, Pate's grievance was presented to the Southern Multi-State Grievance committee, which included three management and three Union representatives.

At this arbitration [2] hearing, the Union initially contended that Pate's discharge was untimely. The Union's business agent, Eugene Brown, pointed out that the company did not discharge Pate until twenty-three days after it had learned about his conduct on April 2. The panel rejected the Union's contention and proceeded to hear the grievance on the merits. The balance of the hearing was devoted to a presentation of the facts concerning Pate's April 2 Thibodaux run. The company introduced documentary evidence showing the discrepancies in Pate's claimed arrival and departure times. The Union defended by reading the grievance itself, which contained Pate's detailed justification for the one-and-a-half hours he claimed he spent at the Thibodaux terminal. The Union also argued that the company had treated Pate more severely than other drivers: other drivers who had claimed excessive "drop and hook" time were not discharged, but merely had the time deducted from their claimed pay. Union representative Brown said nothing at the hearing about the nu-

---

**2.** Under the provisions of the agreement, hearings before a neutral arbitrator would have been the next step in the proceedings had this hearing resulted in a tied vote; however, since neither of the parties questions that this was an arbitration hearing that could properly be subject to deference, we shall assume that it was.

merous prior grievances that Pate had filed or about any alleged threats or warnings by company supervisors regarding employee grievance filing. At the conclusion of the hearing, the committee deliberated and with no "on-the-record" discussion of its reasoning, announced that Pate's discharge was upheld.

## II

On the basis of these facts, the Board, in agreement with the ALJ, concluded that the company violated sections 8(a)(3) and (1) of the Act, 29 U.S.C. §§ 158(a)(3) and (1), by discharging Pate because of his successful grievance-filing activities. The Board also found that deferral to the arbitration award upholding Pate's discharge was not appropriate because the arbitration panel did not consider the unfair labor practice issue. Finally, the Board found that the company violated section 8(a)(1) of the Act by Supervisor Magana's telling another employee that Pate was discharged because he had filed grievances.

The Board ordered the company to cease and desist from the unfair labor practices found, and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of their rights under section 7 of the Act, 29 U.S.C. § 157. Affirmatively, the Board ordered the company to offer Pate immediate and full reinstatement to his former job; to make him whole for any loss of pay he may have suffered as a result of his unlawful discharge; to remove from its files any reference to the unlawful discharge and to notify Pate in writing that this has been done; and to post an appropriate notice.

## III

■ Ryder argues that the Board erred by refusing to defer to the decision of the arbitration panel to uphold Pate's discharge. We disagree, and uphold the Board's refusal to defer.

In *Olin Corp.*, 268 N.L.R.B. 573 (1984), the Board stated that it would defer to an arbitration decision regarding an unfair la-

bor practice if (1) the contractual issue is factually parallel to the unfair labor practice issue and (2) the arbitrator was presented generally with the facts relevant to resolving the unfair labor practice issue. 268 N.L.R.B. at 574. In this case, the ALJ held that deferral was inappropriate because the crucial evidence pertaining to whether Pate was discharged for improper reasons was not presented at the arbitration hearing. We agree with the ALJ that the arbitration panel was not presented with important relevant facts concerning Ryder's motivation in discharging Pate. The issue before the ALJ and the Board was whether Ryder had discharged Pate for his grievance-filing activity. The arbitration proceedings addressed only the issue of whether Ryder had good cause to discharge Pate under the collective bargaining agreement. Although the arbitration hearing dealt to some degree with Pate's claim that he was treated more severely than other drivers, it did not consider evidence pertaining either to Pate's prior history of grievance filing or the company's alleged hostility to grievance filing.

We review a Board decision regarding deferral only for abuse of discretion, *NLRB v. South Central Bell Telephone Co.*, 688 F.2d 345, 350 (5th Cir.1982). Because we agree with the Board that facts relevant to the unfair labor practice were not presented in the arbitration proceeding, there is simply no basis for our finding an abuse of discretion. We therefore uphold the Board's refusal to defer.

## IV

We now turn to the principal focus of our inquiry: whether substantial evidence supports the Board's findings (1) that Pate's grievance filing was a motivating factor in his discharge, and (2) that Ryder failed to meet its burden to show that it would have discharged Pate in the absence of his protected activity. We conclude that although substantial evidence supports the Board's first finding, it does not support the Board's second finding.

■ Because Pate's discharge involved both permissible and impermissible grounds, the Board's inquiry into the discharge required a mixed-motive analysis under the standards set out in *Wright Line, a Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), *enf'd* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 *approved in NLRB v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Under *Wright Line,* the General Counsel bears the initial burden of proving that protected concerted activity was a substantial factor that prompted the discipline imposed by the employer. If this burden is met, the burden shifts to the employer to prove affirmatively that the disciplinary decision would have been the same in the absence of the protected conduct.[3]

■ In reviewing decisions by the Board, we determine, on the basis of the record taken as a whole, whether substantial evidence supports the Board's findings. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *NLRB v. Wellfed Catfish, Inc.,* 674 F.2d 1076, 1078 (5th Cir.1982). In determining whether the Board's decision is supported by substantial evidence, we must also consider the evidence that fairly detracts from the Board's decision. *Universal Camera Corp. v. NLRB,* 340 U.S. at 488, 71 S.Ct. at 464; *NLRB v. Esco Elevators, Inc.,* 736 F.2d 295, 298 (5th Cir.1984). We note also that we must accord great deference to the credibility determinations of the ALJ, and the Board. *NLRB v. Laredo Packing Co.,* 730 F.2d 405, 408 (5th Cir.1984); *NLRB v. Proler International Corp.,* 635 F.2d 351, 355 (5th Cir.1981).

### A.

■ Applying these standards, our review of the record persuades us that although substantial evidence supports the Board's conclusion that Pate's protected ac-

tivity was a motivating factor in his discharge, substantial evidence does not support the Board's conclusion that Ryder would not have discharged Pate in the absence of his protected activity.

The evidence showed that Pate, when compared to other employees, filed a very high number of successful grievances requiring the company to lay out some money. Additionally, the ALJ credited testimony showing that a Pate co-worker, Cullen, had been told that his grievance filing was not looked upon favorably and that had he not been transferred to another terminal he would have been fired. The ALJ also credited testimony by another Ryder employee, Jordan, that revealed that Julio Magana, one of Pate's supervisors, told Jordan that Pate had been fired for his grievances.

Furthermore, the ALJ did not credit the testimony of Tom Davis, the supervisor who fired Pate, and Julio Magana, another supervisor, when they testified that they were generally unaware of Pate's grievance history. The ALJ concluded that Davis' admitted investigation into several of Pate's grievances would have brought his history of grievance-filing to light, and that Magana's testimony regarding his knowledge of Pate's grievances was internally inconsistent. The ALJ's failure to credit this relevant testimony, significantly undermined Ryder's position at the hearing, which was that because its supervisors were not aware of Pate's grievance activity, they could not have acted against him on that basis. The ALJ acted within her prerogative.

Thus, substantial evidence supports the finding that Ryder was hostile to employee grievance-filing, that Pate filed a substantial number of successful grievances, and that Ryder was motivated to fire Pate for this reason.

### B.

■ We do not find, however, that substantial evidence supports the Board's con-

**3.** Since the filing of grievances is a right rooted in the collective bargaining agreement, invocation of that right is a protected, concerted activi-

ty for purposes of the Act. *See NLRB v. City Disposal Systems, Inc.,* 465 U.S. 822, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984).

508

clusion that Ryder failed to meet its *Wright Line* burden to show that it would have discharged Pate in the absence of his protected activity. Although the Board's findings will be upheld if they are based on plausible inferences drawn from the evidence, *NLRB v. Haberman Construction Co.*, 618 F.2d 288, 296 (5th Cir.1980); *NLRB v. Physicians and Surgeons Community Hospital*, 577 F.2d 305, 307 (5th Cir.1978), the inferences drawn by the ALJ which led to her conclusion that Pate would not have been fired in the absence of his protected activity, are based on a serious misconstruction of the evidence.

As we read her decision, the ALJ gave three reasons for her conclusion that Ryder had not sustained its *Wright Line* burden: (1) Pate's tardiness in arriving at Thibodaux had been singled out for investigation because previous cases of driver tardiness had not resulted in as extensive an investigation; (2) the essence of Pate's offense was claiming excessive time, yet other drivers who had claimed excessive time were treated more leniently and were not discharged; and (3) the delay between Pate's offense and his discharge would not have occurred if the company had had a legitimate basis for his discharge. We address each of these reasons in turn.

The ALJ found that Pate had been singled out for discriminatory treatment since the six previous cases of driver tardiness had not been subject to an equally extensive investigation and follow-up. Yet, according to the record, this was the first case of intentional dishonesty that had occurred at Ryder that any of the witnesses could recall. There was no indication in the record that in any of the previous cases of driver tardiness was there reason to suspect dishonesty (and hence to trigger a more extensive follow-up), while in this case, according to testimony, there certainly was such reason. Further, according to the credited testimony of witnesses Lockett and Catton, the same initial procedures for reporting driver tardiness that were followed in the previous cases were followed in this case.

The ALJ next concluded that Pate had been the victim of discriminatory treatment for his grievance filing because other employees had received much more lenient treatment for committing essentially the same offense of claiming excessive time. There are several reasons why this conclusion cannot follow from the evidence. First, the ALJ disregarded, or did not understand, the fact that Pate's claim, unlike previous claims, involved outright dishonesty, and it was on grounds of dishonesty that Ryder based the discharge. The ALJ compared Pate's situation to that of drivers who claimed payment for "drop and hook" time in excess of the time allowed. In those situations, Ryder's policy was to reject the employee's claim, and to pay only the allowed amount, unless a driver gave an explanation that was accepted by Ryder. When Ryder did not accept the driver's explanation, the driver could file a grievance to claim the pay. Pate's case was significantly different because Pate was known to have wilfully falsified his time records. Pate's action therefore involved not only a claim for time in excess of that allowed, but also something that was not present in previous cases: intentional dishonesty. Second, unlike the claiming of unallowed time, under the terms of the collective bargaining agreement between Ryder and the union, dishonesty constitutes sufficient grounds for discharge. A joint labor-management arbitration panel upheld Pate's discharge because it was based on a violation of the terms of the agreement. Third, the record makes it clear that, among all the incidents in evidence, this was the only case of intentional dishonesty. There is therefore no evidence in the record to show that dishonesty at Ryder was either widespread or condoned. Hence no evidence was adduced to show that Pate's dishonesty would have been overlooked by Ryder in the absence of his grievance filing.

Finally, the ALJ concluded that Ryder delayed its discharge of Pate because it was seeking to add evidence to bolster its case for discharging him. Yet we fail to see how this delay relates only to indicating

an unfair-labor-practice discharge when this discharge was based on mixed motives. Even without improper motivation, the gathering of additional evidence was important because of the anticipated arbitration hearing. Thus, there is no basis for concluding that Ryder's delay in discharging Pate would not have occurred in the absence of his union activity.

As we have noted, this is not a case where dishonesty was widespread or condoned by the employer. Rather, this is a case where an employee was fired when he had committed an obvious act of intentional dishonesty in violation of the collective bargaining agreement. No such conduct, as far as the evidence showed, had occurred before. We conclude, therefore, that substantial evidence does not sustain the Board's finding that Ryder failed to meet its *Wright Line* burden to show that it would have discharged Pate in the absence of his grievance filing.[4]

### V

Ryder does not seek review of that portion of the Board's order finding that it violated section 8(a)(1) of the Act when Supervisor Magana told employee Jordan that Pate had been fired for his grievances. Accordingly, we do not disturb that portion of the Board's order.

### VI

For the reasons discussed earlier in this opinion, we deny enforcement of that portion of the Board's order requiring Ryder to reinstate Pate with back pay; however, we grant enforcement of that portion of the Board's order finding that Ryder violated section 8(a)(1) of the Act in connection with Magana's remarks to employee Jordan.

ENFORCEMENT GRANTED IN PART AND DENIED IN PART.

**4.** We also note that the ALJ found that Ryder imposed "a draconian sanction upon an employee with a 7 year-unblemished record." This conclusion appears to be unsupported by substantial evidence. Although it is true that Pate had not been subjected to disciplinary action during his career at Ryder, there was ample testimony in the record regarding problems with Pate's work and attitude. It thus cannot be said that the absence of disciplinary action creates an unblemished record just as it cannot be said that an absence of criminal convictions makes a person a model citizen.