THIRD DIVISION
December 8, 2010

No. 1-09-2582

| | | |
|---|---|---|
| PACE SUBURBAN BUS DIVISION OF THE | ) | Petition for Review from the |
| REGIONAL TRANSPORTATION | ) | Illinois Labor Relations |
| AUTHORITY, d/b/a Pace Northwest Division, | ) | Board - State Panel |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | No. S-CA-05-217 |
| v. | ) | |
| | ) | |
| ILLINOIS LABOR RELATIONS BOARD, | ) | |
| STATE PANEL, and URSZULA T. | ) | |
| PANIKOWSKI, | ) | |
| | ) | |
| Respondents. | ) | |

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Petitioner Pace Suburban Bus Service, a division of the Regional Transportation

Authority, d/b/a Pace Northwest Division (Pace), appeals from a decision and order of the Illinois

Labor Relations Board, State Panel (Board), finding that Pace violated section 10(a)(1) of the

Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1) (West 2008)) by discharging

respondent, Urszula Panikowski, in retaliation for filing a grievance for reinstatement in 1999.  On

appeal, Pace contends that this court should reverse the Board because: (1) Panikowski failed to

prove that her discharge was motivated by antiunion animus; (2) the Board's order was based

solely on a finding that Pace offered "shifting explanations" for discharging Panikowski, which

alone is not sufficient to establish that it had an improper motive for discharging Panikowski; (3)

the Board erred in refusing to consider Pace's argument that it had a legitimate business reason for discharging Panikowski; and (4) the Board improperly relied on evidence of conduct that occurred outside of the Act's six-month statute of limitations. For the reasons set forth below, we affirm the decision and order of the Board.

## I. BACKGROUND

Urszula Panikowksi began working for Pace as a bus operator in 1992. During her employment she was a member of the Amalgamated Trust Union (Union), the exclusive representative of a bargaining unit at Pace that includes bus operators. Pace discharged Panikowski in February 2005 on grounds that she violated Pace's rules during a confrontation with a bus passenger and for her "entire work record." On June 21, 2005, Panikowski filed an unfair labor practice charge against Pace alleging that she had been discharged in retaliation for filing a grievance after she had been discharged in 1999. The matter was heard by an administrative law judge (ALJ) on November 14 and 15, 2007, and March 20, 2008. Based on testimony and exhibits presented at the hearing, the ALJ issued a recommended decision and order finding that Pace violated section 10(a)(1) of the Act because it discharged Panikowski in 2005 in retaliation for her filing a grievance in 1999 that resulted in her reinstatement and an award of back pay.

In his recommended decision and order, the ALJ reviewed Panikowski's employment history with Pace, which included numerous customer complaints and disciplinary actions. First, in 1996, Pace suspended Panikowski after she was involved in a verbal altercation with a bus passenger, who alleged that in response to her question about when the bus was scheduled to

depart, Panikowski told her to "shut up" and said "I put up with this shit eleven hours a day." Rather than terminating her employment, Pace permitted Panikowski to sign a last-chance agreement pursuant to which she was given a suspension and four months probation and allowed to return to work on a last chance basis.

By 1999, Panikowski had accrued 35 complaints, 22 involving discourtesy or improper passenger service, and in October of that year, Pace terminated her employment based on charges that she had been involved in another verbal altercation with a passenger, had failed to report an incident involving high school students, and had caused damage to a bus and failed to report it. The union filed a grievance on Panikowski's behalf alleging that Pace did not have sufficient cause to terminate her employment, and in September 2001, an arbitrator ordered Pace to reinstate Panikowski with back pay. The arbitrator, who focused primarily on the charge regarding damage to the bus, concluded that although there was just cause for discipline, Pace failed to establish sufficient cause for discharge and failed to establish that Panikowski in fact caused the damage to the bus. The arbitrator suggested that another bus operator, Gina Barsano, might have been responsible for the damage, stating "I am reluctant to conclude, and I do not conclude that [Gina] Barsano caused the damage to the bus although one might be inclined to say that such a conclusion derives inevitably from these observations." Gina Barsano's brother, James Barsano, was, at that time, one of Panikowski's supervisors and conducted a "field investigation" of the bus accident that led to Panikowski's discharge. When Panikowski was discharged in 2005, Barsano, as well as other members of Pace management who were involved in the 1999 discharge, were still Panikowski's supervisors, including Michael Strauss, Stan Pataluch, Pace regional manager

1-09-2582

Brett Burkhardt, and Pace Superintendent Richard Foster. Panikowski contends that the arbitrator's award of back pay remained an issue between her and Pace, directly involving Superintendent Foster, until at least December 2004, because the parties disagreed about the amount owed.

Following her reinstatement, Panikowksi was involved in several incidents between 2001 and 2005, four of which Pace cites as grounds for her 2005 discharge. Three of those incidents are related to a July 6, 2004, motor vehicle accident at Golf Mill Shopping Center in Glenview, Illinois. According to Panikowski, the driver of a pickup truck who was attempting to change lanes drove into the mirror on the left-hand side of the bus. Pace subsequently investigated the accident and determined that it was "preventable." Panikowski appealed that finding to an accident review board, which upheld Pace's finding.

After the accident, Panikowsi had an interaction with Glenview police officer Stacey Carver, who responded to the accident scene. According to Panikowski, Carver approached the bus and asked for her identification and insurance card. Panikowski said that she gave Carver her identification but told her that because Pace is self-insured, she does not have an insurance card. Panikowski also testified that she told Carver that there was a witness to the accident, but Carver responded that she did not care. Carver, however, gave a different version of events, testifying that she told a Pace supervisor at the scene that Panikowski was rude, uncooperative, and argumentative. The next day, Carver spoke on the phone with Pace supervisor James Barsano. There is a dispute as to who initiated this call, with Carver testifying that Barsano called her and asked her to submit a complaint letter to Pace regarding Panikowski's conduct and Barsano

-4-

testifying that Carver called him. Carver did send a letter to Pace stating that Panikowski repeatedly ignored her requests for her driver's license and registration and her requests to move the bus. According to Carver's letter, Panikowski also interrupted Carver's questioning, was argumentative, "exemplified little respect," and engaged in "verbal abuse."

After Panikowski left the accident scene, a Pace supervisor told her to drive to the Cumberland Circle station and wait for a replacement bus. Some time later, part-time bus operator Steve Wessel arrived with a bus. According to Panikowski, she asked Wessel why he took so long and he replied that there had been no buses available. However, shortly afterwards, Wessel submitted an incident report stating that when he arrived with the bus, Panikowski asked him "what took you so long," and "why did you bring me this piece of shit bus" and kept saying, "I don't care. I don't care."

Pace subsequently disciplined Panikowski by suspending her and requiring her to attend retraining sessions. According to Pace, Panikowski was removed "from service pending investigation regarding verbal altercation[s] with Glenview police officer [Carver] and operator Steve Wessel." Panikowski testified at the hearing, however, that she believed she was being suspended for the accident and for a verbal altercation with Wessel and was not aware that she was charged with misconduct involving Officer Carver.

The fourth incident cited by Pace as grounds for discharging Panikowski involved bus passenger George Wang, who was a regular rider on Pace's Cumberland Circle route. Three bus operators testified at the hearing regarding their interactions with Wang, stating that Wang was unfriendly and repeatedly made comments about their driving and about the bus leaving the

station on time. They also testified that because Wang could take any one of three buses that left the station at around the same time, Wang would stand in the front doorway of a bus and if another bus left first, he would jump off to board that bus. Panikowski also testified that Wang was a difficult passenger who complained about the bus leaving late, and she said that in January 2005, she talked to Pace supervisors Foster and Barsano to ask for help in dealing with him and was told to "do your best" and to "avoid him." She also testified that neither Pace nor the union acted on her requests to have a supervisor ride that route on her bus. Shortly afterwards, on January 20, 2005, a bus passenger who did not identify himself, but who was later determined to be Wang, called Pace to complain that Panikowski had left the Cumberland Circle station late and was rude to him. Pace investigated the complaint and after determining that the bus did not leave the station late, did not discipline Panikowski.

On February 2, 2005, Panikowski's supervisor, Barsano, informed her that she was being suspended pending an investigation into another complaint from Wang, who asserted that on February 1, 2005, after he boarded Panikowski's bus, she got out of her driver's seat, walked back to where he was sitting, pointed at him, called him a liar, and asked if he would like it if she called his boss and lied about him. Pace investigated the complaint by sending several supervisors to the Cumberland Circle station over several days to find witnesses to the incident. Two witnesses were located, one who testified that she was on another bus and saw Panikowski get up out of her seat and go up to a rider and "aggressively verbally talk to them while shaking her finger" and another witness, who had been on Panikowski's bus on February 1, 2005, and provided a written statement corroborating Wang's complaint.

Pace supervisors Foster and Barsano subsequently met with Panikowski, the union president, and a union steward regarding Wang's accusations, which Panikowski denied. Pace division manager Foster testified that after the meeting he reviewed the evidence and Panikowski's file and recommended that she be terminated. Final authority regarding terminations, however, rested with Pace regional manager Brett Burkhardt, who reviewed the file, met with Foster and decided to terminate Panikowski. On February 17, 2005, Pace issued a letter to Panikowski, signed by Foster, stating that it was discharging her because its investigation determined that she violated several Pace rules, which were listed in the letter and for her "entire work record."

On March 17, 2005, Panikowski met with Pace managers Foster, Barsano, and Strauss and union representatives, at which time Pace offered Panikowski a last-chance agreement. Panikowski testified that she rejected the last-chance agreement but that after she left the building she was approached by Foster in the parking lot, who told her that she had accidentally been given another employee's last chance agreement and asked her to return to the meeting. Panikowski went back in and was given a blank page to sign, which she was told was a release form for the last-chance agreement. Panikowski testified that she signed the paper because she wanted her job back, but was unhappy because her union steward signed "very low" and she wanted to sign it higher up because there was an open space left on the page. Later, when she went to apply for unemployment benefits, Panikowski learned that the blank page she had signed was actually the last-chance agreement. A few days later, however, on March 21, 2005, Panikowski met with Foster and gave him a written statement rejecting the last-chance agreement

On June 24, 2005, Panikowski filed an unfair labor practice charge with the Board alleging that Pace violated section 10(a)(1) of the Act by discharging her in retaliation for filing a grievance following her 1999 discharge that resulted in her being reinstated to her job in September 2001.[1] On November 30, 2005, the Board dismissed the charge. Panikowski appealed and pursuant to an order dated March 7, 2006, the Board reversed the dismissal and remanded for further investigation. On June 19, 2007, the Board issued a complaint for hearing against Pace, alleging that Pace discharged Panikowski in retaliation for her successfully invoking a contractual grievance procedure provided for in the labor agreements in effect between Pace and the union, and that in doing so, Pace interfered with, restrained, or coerced a public employee in exercise of the rights guaranteed by section 10(a)(1) of the Act. Pace filed a timely answer asserting that Panikowski's 2005 discharge was motivated by her misconduct, that no hostility existed following her 2001 reinstatement, and that even if there was lingering hostility, business reasons would have dictated that she be discharged for her misconduct.

Following a three-day hearing, the ALJ issued a recommended decision and order finding that Pace discharged Panikowski in retaliation for her previous successful pursuit of her grievance

---

[1] Section 10(a)(1) makes it an unfair labor practice for an employer to "interfere with, restrain or coerce public employees in the exercise of the rights guaranteed in this Act." 5 ILCS 315/10(a)(1) (West 2008). Although Panikowski's charge alleged a violation of section 10(b) of the Act, which addresses unfair labor practices by labor organizations rather than employers, it is clear from the allegations in the charge and from the allegations in the Board's subsequent complaint that Panikowski intended to allege a violation of section 10(a) of the Act.

for wrongful discharge in violation of section 10(a)(1) of the Act. The ALJ's order stated that to establish a prima facie case in support of a section 10(a)(1) violation, a charging party must prove, by a preponderance of the evidence that: (1) she was engaged in protected concerted activity; (2) respondent had knowledge of such activity; and (3) respondent took adverse employment action against her because of her involvement in that activity. The ALJ found that Panikowski met these three requirements because her 1999 grievance constituted protected activity under section 10(a)(1), Pace's managers involved in the 2005 discharge, who were some of the same parties involved in the 1999 discharge, had knowledge of such protected activity, and Pace fired her in retaliation for her protected activity. Although the ALJ did not find direct evidence of retaliation, he inferred Pace's illegal motive from its "shifting explanations and manufactured reasons for discharging" Panikowski, as well as its disparate treatment of Panikowski during her employment with Pace.

As evidence of shifting explanations, the ALJ noted that at the time of her discharge, Pace cited Panikowski's entire employment history as the cause, but at the hearing, Pace supervisors also cited the 2005 Cumberland Circle station incident involving Wang and the three incidents in 2004 related to the Golf Mill Mall accident as grounds for her termination. Further, the ALJ noted that Foster also claimed to rely on the 1996 discharge documents and regional manager Burkhardt stated that he relied on various documents in Pace's files, verbal reports from Foster, Barsano and Strauss, Panikowski's reports of the incidents, and a synopsis of Panikowski's employment record, which no longer exists. The ALJ also cited Pace's shifting explanations for who was responsible for deciding to discharge Panikowski, noting that Foster first claimed to only

having made a recommendation but later said that he was part of the decision process.

With regard to the four incidents Pace cited as ground for discharging Panikowski, the ALJ found that they were a pretext, used by Pace to discharge her in retaliation for her successful 1999 grievance. First, with regard to Panikowski's 2004 accident at Golf Mill Mall, the ALJ found that there was no evidence to support Pace's conclusion that Panikowski could have prevented the accident and discounted the accident review board's subsequent affirmation of Pace's finding by noting that two Pace supervisors, who were also supervisors when Panikwoski was discharged in 1999, were on the review board. As to her subsequent interaction with police officer Stacy Carver, the ALJ found that Carver's complaint letter was internally inconsistent and so incoherent that no reasonable manager would have relied on it. The ALJ also found Carver's testimony that Barsano called her and asked her to send the letter was further evidence that the incident was manufactured by Pace. As for Panikowski's subsequent interaction with bus operator Steven Wessel, who brought her a replacement bus, the ALJ found that her conduct may have been "tiresome" but not particularly rude.

Finally, as to the fourth incident that Pace relied on as grounds for discharging Panikowski, her altercation with passenger Wang, the ALJ found that the effort Pace supervisors made to investigate Wang's complaint while failing to conduct similar investigations of other bus operators who received passenger complaints of discourteous conduct was also evidence of Pace's illegal motivation for discharging Panikowski. The ALJ concluded that all of these factors, which alone are not sufficient to form the basis of an inference that Pace discharged Panikowski in retaliation, do, when properly considered, corroborate such an inference and are grounds for

finding that Pace committed an unfair labor practice. The ALJ also rejected Pace's argument that its offer of a last-chance agreement to Panikowski showed that it was not vindictive toward Panikowski because there was insufficient evidence showing that the agreement was comparable to agreements offered to other discharged employees.

After finding that Panikowski established a prima facie case of a section 10(a)(1) violation, the ALJ addressed Pace's argument that it had a legitimate business reason for discharging Panikowski due to her employment record, the 2004 Golf Mill incidents, and the 2005 incident involving George Wang. Based on his prior analysis that Pace managers engaged in sham investigations to fabricate disciplinary incidents, the ALJ rejected the defense and concluded that the proffered business justification was manufactured pretext. The ALJ ordered Pace to, among other things, reinstate Panikowski and make her whole for loss of any pay or benefits, with interest at 7% per annum.

In response to the ALJ's recommended decision and order, Pace filed 86 exceptions and a brief. On September 4, 2009, the Board issued its decision and order accepting the ALJ's recommended order. The Board rejected Pace's argument that the ALJ erred because Panikowski failed to show that Pace's termination of her was motivated, in whole or in part, on antiunion animus. The Board agreed that Panikowski did not make such a showing but found that although such a failure might have been fatal to her claim had she alleged a violation of section 10(a)(2) of the Act, "[s]he did not so allege *** and instead, proved the elements of a violation of Section 10(a)(1)."

The Board also rejected Pace's assertion that its offer to Panikowski to return to work

-11-

under a last-chance agreement disproved any illegal motive. The Board found that Panikowski's rejection of the agreement was based on a well-founded belief that Pace would use the agreement as a means of discharging her during the period she was on probation. The Board also agreed with the ALJ that the existence of the agreement was irrelevant with regard to whether Pace discharged her for vindictive reasons.

Lastly, the Board rejected Pace's assertion that the ALJ erred in considering events that occurred more than six months prior to the filing of a charge with the Board pursuant to section 11(a) of the Act. The Board found that a charging party may rely on events outside the limitations period to show the nature of the challenged events but not to prove that they were, in fact, a series of unremedied unfair labor practices. The Board concluded that the ALJ properly used the earlier events to "shed light on true character of matters occurring within the limitations period." Pace now appeals.

## II. ANALYSIS

### A. Standard of Review

Review of a decision of the Labor Board is governed by the Administrative Review Law. 5 ILCS 315/11(e) (West 2008); 735 ILCS 5/3-113 (West 2008). The scope of our review extends to all questions of law and fact presented by the record. 735 ILCS 5/3-110 (West 2008). "The applicable standard of review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law." American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, 216 Ill. 2d 569, 577 (2005). Questions of law are reviewed de novo. City of Belvidere v. Illinois State Labor

Relations Board, 181 Ill. 2d 191, 205 (1998). The Labor Board's findings of fact are "held to be prima facie true and correct" (735 ILCS 5/3-110 (West 2008)) and will be disturbed on review only if they are against the manifest weight of the evidence. City of Belvidere, 181 Ill. 2d at 205. The Labor Board's resolution of a mixed question of law and fact will be reversed on appeal only when it is clearly erroneous. American Federation of State, County & Municipal Employees, Council 31, 216 Ill. 2d at 577. Here, the Board's decision and order finding that Pace committed an unfair labor practice by discharging Panikowski for engaging in protected activity in violation of section 10(a)(1) of the Act presents both questions of law and questions of fact and each will be reviewed under the appropriate standard.

### B. Antiunion Animus

On appeal, Pace first argues that the Board's order is erroneous because Panikowski failed to establish that her discharge was motivated by antiunion animus, which Pace asserts is required to establish a violation of section 10(a)(1) of the Act. Although the interpretation of statute is a question of law which we review de novo (Taddeo v. Board of Trustees of the Illinois Municipal Retirement Fund, 216 Ill. 2d 590, 595 (2005)), we will not substitute our construction of a statutory provision when, as in this case, the agency charged with the administration of the statute has adopted a reasonable interpretation. Church v. State of Illinois, 164 Ill. 2d 153, 162 (1995). Pace relies on City of Burbank v. Illinois State Labor Relations Board, 128 Ill. 2d 335 (1989), to support its argument. In City of Burbank, the city "restructured" its public works department by eliminating two foremen positions and creating one position to replace them. City of Burbank, 128 Ill. 2d at 342. The Board found that the City had engaged in unfair labor practices under

-13-

sections 10(a)(1), (a)(2) and (a)(3) of the Act because the "restructuring" was a pretext for discharging one of the foremen, Robert Randle, who was active in getting the American Federation of State, County and Municipal Employees, AFL-CIO (AFSCME), certified as the exclusive bargaining representative of the department's employees. City of Burbank, 128 Ill. 2d at 342-43. As a result, the Board ordered the city to remove the foreman it appointed and to reinstate Randle. City of Burbank, 128 Ill. 2d at 344.

In affirming the Board's order, our supreme court held that, "Where an employer is charged with an unfair labor practice because of the discharge of an employee engaged in protected activity, the charging party must first show, by a preponderance of the evidence, that the adverse employment action was 'based in whole or in part on antiunion animus-or *** that the employee's protected conduct was a substantial motivating factor in the adverse action.' " City of Burbank, 128 Ill. 2d at 345, quoting National Labor Relations Board v. Transportation Management Corp., 462 U.S. 393, 401, 76 L. Ed. 2d 667, 675, 103 S. Ct. 2469, 2474 (1983). Pace asserts that because the Board acknowledged that Panikowski failed to demonstrate that her termination was motivated, in whole or in part, by antiunion animus, the Board should have found that she failed to establish a prima facie case of an unfair labor practice. Instead, Pace contends, the Board inserted a prohibited motive into the analysis, namely that adverse action was taken against Panikowski for her involvement in "protected activity," and in so doing, created a "moving target" standard for establishing a section 10(a)(1) violation. As a result, Pace argues, the Board's findings are erroneous as a matter of law.

Respondents contend, however, that to prove a retaliatory discharge claim under section

10(a)(1) of the Act, an employee must demonstrate retaliation for engaging in activity protected by the Act, regardless of whether it is considered union activity or the discharge was otherwise motivated by antiunion animus. Although section 10(a)(1) generally does not require proof of the employer's illegal motive Illinois Fraternal Order of Police Labor Council, 14 PERI ¶2029, at X-177 (ISLRB 1998)), when an employee asserts that she was discharged for engaging in protected activity, she necessarily contends that the employer's motives for her discharge were improper. In those cases, the Board has followed the framework applied in Section 10(a)(2) claims to determine whether a public employer terminated the employee for an illegal motive. Mulligan, 11 PERI ¶3008, at XI-40 (ILLRB 1995). Because section 10(a)(1) broadly protects public employees in exercising their rights under the Act, in contrast to section 10(a)(2), which more narrowly protects union membership and activities, an employer violates section 10(a)(1) if it discharges an employee in retaliation for exercising her rights under the Act, regardless of whether the employee establishes antiunion animus. Therefore, respondents contend, an employee can establish a prima facie case of a section 10(a)(1) violation by demonstrating that (1) she was engaged in a statutorily protected activity; (2) her employer was aware of the nature of her conduct, and (3) the employer took adverse action against her for discriminatory reasons, *i.e.,* animus toward her participation in such activities. We agree.

First, Pace's reliance on City of Burbank is misplaced because there our supreme court held that an employer violates the Act where the discharge is based in whole or in part on antiunion animus or that the employee's protected conduct was a substantial or motivating factor in the adverse action. City of Burbank, 128 Ill. 2d at 345. That language indicates that a showing

of either motivation on the part of the employer is sufficient to establish an unfair labor practice under the Act. Further, we note that the Fifth District of this court adopted this standard in Sheriff of Jackson County v. Illinois State Labor Relations Board, 302 Ill. App. 3d 411, 415 (1999), holding that an employee can establish a prima facie case under section 10 of the Act by proving the same three factors by a preponderance of the evidence. Sheriff of Jackson County, 302 Ill. App. 3d at 415, citing City of Burbank, 128 Ill. 2d at 345-46. Similarly, in Speed District 802 v. Warning, 392 Ill. App. 3d 628 (2009), the First District of the court held that to establish a prima facie case of discriminatory discharge under section 14(a)(3) of the Illinois Educational Labor Relations Act (115 ILCS 5/14(a)(3)(West 2006)), which is analogous to the Act at issue in this case, a complainant must prove that (1) she was engaged in a protected activity; (2) the employer was aware of the activity; and (3) the employer took adverse action against the complainant for engaging in that activity. Speed District 802, 392 Ill. App. 3d at 636. The court further held that the third element of the prima facie case is satisfied when the employee establishes the protected activity was a substantial or motivating factor in the employer's adverse action against the employee. Speed District 802, 392 Ill. App. 3d at 636.

Federal courts interpreting section 8(a)(1) of the National Labor Relation Act of 1935 (29 U.S.C. §158 (2006)), which is analogous to section 10(a)(1) of the Illinois Act, further support the argument that an employee only needs to prove an employer discharged her in retaliation for engaging in a protected activity, such as filing a grievance under a collective bargaining agreement, regardless of antiunion animus. Because there is a close parallel between the Illinois Public Labor Relations Act and the National Labor Relations Act (NLRA), it is appropriate to

examine federal interpretations of the NLRA where those decisions are consistent with the purposes of the Illinois Act. City of Burbank, 128 Ill. 2d at 345. Although the cases cited by respondents do not directly address whether antiunion animus is required to establish a violation of section 8(a)(1), they do support a holding that an employer commits an unfair labor practice under the Act by discharging an employee for engaging in protected concerted activities under the NLRA, such as filing a grievance. See National Labor Relations Board v. City Disposal Systems, Inc., 465 U.S. 822, 836, 852, 79 L. Ed. 2d 839, 104 S.Ct. 1505, 1513 (1984) ("No one doubts that the processing of a grievance *** is concerted activity within the meaning of §7."); Roadmaster Corp. v. National Labor Relations Board, 874 F.2d 448, 452 (7th Cir. 1987) ("It is well settled that the filing of grievances pursuant to a collective bargaining agreement is protected concerted activity under §7"); National Labor Relations Board v. Ryder/P.I.E Nationwide, Inc. 810 F.2d 502, 507 n.3 (5th Cir. 1987) ("Since the filing of grievances is a right rooted in the collective bargaining agreement, invocation of that right is a protected, concerted activity for purposes of the Act").

Further, as previously discussed, section 10(a)(1), unlike section 10(a)(2), broadly protects public employees in exercising their rights under the Act. Therefore, under the plain language of the statute, an employee can establish a prima facie violation of section 10(a)(1) by showing that she was discharged for exercising those rights, including the right to file a grievance against her employer. Requiring the employee to also prove that her employer's actions were motivated by animus toward the union would unduly burden an employee seeking redress against an employer interfering with those rights.

-17-

We next turn to Pace's contention that the Board erred in finding that the evidence presented by Panikowski established a prima facie violation of section 10(a)(1). Pace does not contest that Panikowski was engaged in protected concerted activity under section 10(a)(1) of the Act when she filed her 1999 grievance. Indeed, federal precedent has held that filing and pursuing a grievance pursuant to a collective bargaining agreement are protected concerted activities under sections 7 and 8(a)(1) of the NLRA (City Disposal Systems, Inc., 465 U.S. at 836, 79 L. Ed. 2d at 852, 104 S. Ct. at 1513 ("No one doubts that the processing of a grievance in such a manner is concerted activity within the meaning of §7")), and the Board has similarly recognized filing a grievance as a protected concerted activity under section 10(a)(1) Bryant, 20 PERI ¶73, at 393 (ILRB State Panel 2004). Nor does Pace contend that it was not aware of Panikowski's 1999 grievance or the 2001 arbitrator's award reinstating her employment. Pace does contend, however, that Panikowski failed to establish that there was a causal connection between the employee's protected activity, in this case, filing a grievance, and the employer's adverse action, which Pace asserts is the sin qua non of a violation of the Act.

Our supreme court has held that motive is a question of fact and that the Board may infer discriminatory motive from either direct or circumstantial evidence. City of Burbank, 128 Ill. 2d at 345. Because motive involves a factual determination, the Board's finding must be accepted if supported by substantial evidence. City of Burbank, 128 Ill. 2d at 345. In City of Burbank, the court delineated factors a court may look to in order to infer antiunion motivation including: (1) an employer's expressed hostility toward unionization, together with knowledge of the employee's union activities; (2) the timing of the adverse action in relation to the occurrence of

the union activity; (3) a pattern of an employer's conduct directed at those engaging in union activity; (4) shifting explanations for employer's actions; and (5) inconsistency in the reasons given for its action against the employee as compared to other actions by the employer. City of Burbank, 128 Ill. 2d at 346. Pace contends that Panikowski failed to establish any of the five factors, and therefore, the Board erred in finding that it had an improper motive for discharging Panikowski. Alternatively, Pace asserts that the Board's only stated reason for finding an improper motive, shifting explanations, is, alone, insufficient to establish an improper motive.

It is clear from the record, as Pace asserts, that the ALJ found that neither the first factor, an employer's expressed hostility toward unionization, nor the third factor, a pattern of conduct directed at those engaging in union activity was present, as his recommended decision states that Pace expressed no hostility toward the union and "there is no evidence that any disparity of treatment as to complaints reflects a pattern on protected union or concerted activity." As for the second factor, the timing of the adverse action in relation to union activity the ALJ acknowledged that the time period between the protected activity in 1999 and the discharge in 2005 was too remote to infer a causal relationship. The ALJ made no findings of fact or conclusions of law regarding the fifth factor, inconsistencies between the proffered reason for discharge and other actions of the employer.

Therefore, Pace asserts, the ALJ must have rested his finding of a prohibited motive solely on the final factor, the employer's shifting explanations. Further, Pace asserts, the ALJ's finding that shifting explanations existed was based on Superintendent Foster's testimony during which he first cited Panikowski's entire employment history as a reason for her termination and then stated

that there were three incidents, escalating in severity, which led to his recommendation of termination. Pace asserts, however, that Panikowski's termination letter states that she was removed from service pending investigation of the February 1, 2005, incident involving George Wang and that a subsequent investigation determined that she violated several rules in Pace's General Rule Book. The letter then stated that"[b]ased on the above, and your entire work record, your employment at Pace Northwest Division is terminated, effective immediately." Pace asserts that no reasonable person could find, based on this letter, that Panikowski was discharged for her entire work history. Pace also contends that the ALJ placed too much weight on Foster's testimony stating that he considered the 1996 last-chance agreement in making the termination decision, because Foster only said that he reviewed it and found it strange that Panikowski had not been terminated, and that this is not evidence of shifting rationales for her discharge.

Alternatively, Pace contends that shifting explanations alone are not sufficient to establish that an employer had an improper motive for discharging an employee. For support, Pace cites American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, 175 Ill. App. 3d 191 (1988) (hereafter, AFSCME, Council 31). In that case, this court held that the fact that two employees who were active union members were terminated several days after the certification of the union was not sufficient to establish the employer's union animus. AFSCME, Council 31, 175 Ill. App. 3d at 200. "It is but one factor to be weighed with the others. Standing alone, or even together with the hazy disparate treatment evidence presented, it is insufficient to establish union animus," the court stated. AFSCME, Council 31, 175 Ill. App. 3d at 200. Similarly, Pace contends in this case a finding of shifting explanations

alone is not sufficient to establish an improper motive.

Respondents assert, however, that Pace's reliance on AFSCME, Council 31 is misplaced because in the instant case, the Board did not rely on temporal proximity alone in finding that Pace had an improper motive for firing Panikowski. Instead, respondents contend, the Board found that Pace manufactured reasons for discharging Panikowski and treated her differently than other bus operators, and that these are grounds for inferring an improper motive by an employer. See York Products, Inc. v. National Labor Relations Board, 881 F.2d 542, 545 (8th Cir. 1989) ("[b]oth implausible explanations and false or shifting reasons support a finding of illegal motivation"); Pollard v. Rea Magnet Wire Co., 824 F.2d 557, 559 (7th Cir. 1987) (holding that in a Title VII case alleging racial discrimination, "[i]f the employer is trying to hide its real reason, that effort - coupled with the evidence making up the employee's prima facie case-may convince the trier of fact that the real reason needed to be hidden and therefore probably was discriminatory."). For support, respondent cites Temp-Masters, Inc. v. National Labor Relations Board, 460 F.3d 684 (6th Cir. 2006), which stated that "[i]n determining whether discriminatory motivation exists, *** the Board may rely on a subset of the relevant factors and, often, not all factors will be present in a specific case." Temp-Masters, Inc., 460 F.3d at 693 citing W.F. Bolin Co. v. National Labor Relations Board, 70 F.3d 863, 871 (6th Cir. 1995). The subset of factors identified in W.F. Bolin, as permitting a reasonable inference of discriminatory motivation, include the company's expressed hostility toward unionization combined with knowledge of the employees' union activities; inconsistencies between the proffered reason for discharge and other actions of the employer; disparate treatment of certain employees compared to other employees

with similar work records or offenses; a company's deviation from past practices in implementing the discharge; and proximity in time between the employees' union activities and their discharge. W.F. Bolin, 70 F.3d at 871.

Here, the Board found that the ALJ correctly inferred a discriminatory motivation based on his finding that the reasons offered by Pace managers for discharging Panikowsi were shifting and not believable, that Pace treated Panikowski differently from other employees by undertaking unprecedented efforts to investigate customer complaints against her, and by imposing disparate discipline on her. All of these factors, the Board found, demonstrate that Pace sought to disguise its true motive for discharging her. We agree. First, the Board inferred an improper motive from its finding that Pace's investigation into the July 2004 Golf Mill accident and the subsequent complaint from Office Carver was fabricated by Pace supervisors in order to discipline Panikowski. This finding was based on the Board's conclusion that there was no basis for finding Panikowski at fault for the accident. Despite the fact that the accident review board, which included two bus operators, confirmed Pace's finding that the accident was preventable, the Board found that the credibility of this finding was undercut by the fact that two Pace supervisors, who were also Panikowski's supervisors when she was discharged in 1999, were on that accident review board. Further, the Board found that Officer Carver's written complaint was not credible and that her testimony stating that Pace asked her to write the complaint letter was further evidence that Pace manufactured reasons for discharging Panikowski. With regard to the incident involving bus passenger George Wang, the Board found that Pace's "highly unusual" investigation, which included sending Pace supervisors to the Cumberland Circle station to find

witnesses. Given that other bus operators who had similar complaints filed against them were not similarly investigated by Pace, the Board found that this disparate treatment of Panikowski was further evidence of its improper motive. Lastly, the Board found that Pace's offer of a last-chance agreement to Panikowski was not evidence that it was not behaving in a vindictive manner toward Panikowski because Pace did not present evidence showing that the agreement was comparable to agreements offered to other discharged employees.

Motive is a question of fact, and the Board's finding must be upheld if it is not against the manifest weight of the evidence. City of Burbank, 128 Ill. 2d at 345; Speed District. 802, 392 Ill. App. 3d at 634. A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based on the evidence. City of Belvidere, 181 Ill. 2d at 205. Here, the Board's finding that Pace had an improper motive for discharging Panikowksi in violation of section 10(a)(1) of the Act was not against the manifest weight of the evidence.

C. Business Justification Defense

Next, Pace contends that the Board erred in failing to apply the dual motive analysis to Pace's business justification defense. Once a charging party establishes a prima facie case of an unfair labor practice, the burden shifts to the respondent, who may demonstrate that even absent that prohibited motivation, it would have taken the same action against the charging party for legitimate business reasons. City of Burbank, 128 Ill. 2d at 346. Merely proffering a legitimate business reason for the adverse employment action does not end the inquiry, for it must be determined whether the reasons advanced are bona fide or pretextual. City of Burbank, 128 Ill.

1-09-2582

2d at 346. If the suggested reasons are a mere litigation figment or were not relied upon, then the determination of pretext concludes the inquiry. City of Burbank, 128 Ill. 2d at 346. However, if the employer advances a legitimate reason and is found to have relied upon that reason, then the case is characterized as dual motive and the employer must demonstrate by a preponderance of the evidence that the employee would have been terminated notwithstanding his union involvement. City of Burbank, 128 Ill. 2d at 347

Pace asserts that in his recommended order, the ALJ found that Pace honestly discharged Panikowski for at least some of its proffered justifications, namely, her December 2004 altercation with a motorist. Therefore, Pace contends that the ALJ should have determined under the dual motive analysis set forth in City of Burbank whether Pace had a business justification for discharging Panikowski but, instead, it summarily rejected the defense and did not permit Pace to prove that it would have discharged her for a legitimate business reason. Further, Pace argues that under the "honest belief" rule, since the ALJ concluded that Foster "assumed" that the complaints about Panikowski were true and based his recommendation that she be terminated upon this belief, there was no discriminatory intent on Foster's part and, therefore, there was a legitimate business justification for her discharge. We disagree.

The ALJ, and in turn the Board, found that Pace's proffered business reason for discharging Panikowski was a pretext for retaliating against her for her 1999 grievance. Based on City of Burbank, because the Board and the ALJ found that Pace's business justifications for discharging Panikowski were not bona fide but merely a pretext for retaliation, no further analysis was required. Further, Pace's suggestion that the ALJ found that it had honestly fired Panikowski

-24-

for at least some of its proffered justifications is incorrect, as he found that Pace engaged in sham investigations of Panikowski and treated customer complaints about Panikowski differently from complaints about other bus operators. Therefore, we find that the Board did not err in deciding not to apply the dual motive analysis to Pace's business justification defense.

### D. Statute of Limitations

Lastly, Pace argues that the Board erred in relying on evidence of conduct that occurred outside of the six month statute of limitations provided for in section 11(a) of the Act. Section 11(a) of the Act states, in part, "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of a charge with the Board and the service of a copy thereof upon the person against whom the charge is made, unless the person aggrieved thereby did not reasonably have knowledge of the alleged unfair labor practice or was prevented from filing such a charge by reason of service in the armed forces, in which event the six month period shall be computed from the date of his discharge." 5 ILCS 315/11(a) (West 2006).

Like the Illinois Public Labor Relations Act, the National Labor Relations Act includes a six-month statute of limitations, which the Supreme Court interpreted in Local Lodge No. 1424 v. National Labor Relations Board, 362 U.S. 411, 4 L. Ed. 2d 832, 80 S. Ct. 822 (1960). In that case, the Court held that evidence of occurrences prior to the six-month limitations period are allowed for the limited purpose of "shed[ding] light on the true character of matters occurring within the limitations period." Local Lodge No. 1424, 362 U.S. at 416, 4 L. Ed. 2d at 838, 80 S.Ct. at 826. The Court also stated that "where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor

practice," "it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice." Local Lodge No. 1424, 362 U.S. at 416-17, 4 L.Ed. 2d at 838, 80 S.Ct. at 827. See also, National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 153 L. Ed. 2d 106, 122 S. Ct. 2061, 2072 (2002) (holding that in Title VII cases, the statute of limitations does not bar an employee from using prior acts as "background evidence in support of a timely claim").

This court subsequently addressed the issue in Moore v. Illinois State Labor Relations Board, 206 Ill. App. 3d 327 (1990), where it held, based on Lodge No. 1424, that allegations outside the six-month period could be used as evidence shedding light on the allegations alleging a breach of the duty of fair representation by a failure to process Moore's grievance and by misrepresenting the status of his grievance to him but not as the source of an independent unfair labor practice.

Here, Pace asserts that Panikowsi filed her charge on June 21, 2005, and therefore, the Board had jurisdiction to issue an order based on actions that occurred in the prior six-months. Pace contends that the ALJ's finding that it had "shifting explanations" for its discharge of Panikowski was based on events that occurred outside that six-month limitation, including the accident that occurred on July 6, 2004, resulting in the broken mirror on the bus. According to Pace, the ALJ improperly relied on this accident to establish a prima facie case. Pace asserts that the Board's finding that the ALJ relied on events predating the six-month statute of limitations was proper to "shed light on the true character of matters occurring within the limitations period"

is contradicted by his recommended decision and order in which the ALJ stated that the statute of limitations does not apply with the "usual vigor" and by the extent to which the ALJ analyzed prelimitations events, including incidents that occurred nearly a decade before Panikowski's 2005 discharge. Pace asserts that, as a result, the ALJ's recommended decision and order served to "cloak with illegality that which was otherwise lawful." We disagree.

First, the ALJ considered evidence of prelimitations period conduct because Panikowski alleged that she was discharged in retaliation for her successful grievance challenging her 1999 discharge. As a result, she relied on her interceding employment history to establish Pace's illegal motive for her 2005 discharge, which "shed light on the true character of matters occurring within the limitations period." Local Lodge No. 1424, 362 U.S. at 416, 4 L. Ed. 2d at 838, 80 S. Ct. at 826. Therefore, consistent with Moore and Local Lodge No. 1424, the ALJ appropriately considered Pace's prelimitation period conduct to determine the true character of Pace's motive for its challenged discharge of Panikowski.

Further, it should be noted that Pace's discharge letter to Panikowski stated that she was being discharged for the February 1, 2005, incident and for her "entire work record" and Pace relies on several prelimitations events, such as the July 2004 Golf Mill Shopping Center incident, to establish that it had a business reason for terminating her. Based on its introduction of this evidence as grounds for discharging Panikowski, it should not then be permitted to object to the ALJ's reliance on that evidence in finding that Pace manufactured evidence as a pretext for discharging her.

## III. CONCLUSION

For the foregoing reasons, we affirm the Board's finding that Pace violated section 10(a)(1) of the Act when it discharged respondent Urszula Panikowski.

Affirmed.

MURPHY and STEELE, JJ., concur.