2022 IL App (1st) 201190-U

FOURTH DIVISION
June 30, 2022

No. 1-20-1190

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| TIMOTHY PARKER, | ) | |
| | ) | |
|       Petitioner, | ) | Petition for Review of the |
| | ) | Order of the Illinois Labor |
| v. | ) | Relations Board, Local |
| | ) | Panel |
| THOMAS J. DART, COUNTY OF COOK, and | ) | |
| THE ILLINOIS LABOR RELATIONS BOARD, | ) | |
| LOCAL PANEL, | ) | |
| | ) | ILRB No. L-CA-16-066 |
| | ) | |
|       Respondents. | ) | |

_____

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Affirming the Local Panel of the Illinois Labor Relations Board's decision and finding it was not clearly erroneous where its conclusion was based on petitioner failing to set forth *prima facie* violations of sections 10(a)(1) and 10(a)(2) of the Illinois Public Labor Relations Act.

¶ 2    After petitioner, Timothy Parker (Officer Parker), filed an unfair labor practice charge

against respondents County of Cook (County) and the Sheriff of Cook County (Sheriff), the

Local Panel of the Illinois Labor Relations Board (Board) issued a complaint, and subsequently an amended complaint, alleging that Officer Parker's supervisors "orchestrated" his transfer to a different division. The amended complaint further alleged that, as a result of his transfer, Officer Parker lost overtime earnings and his role as a union steward. The amended complaint also alleged that Officer Parker's supervisors retaliated against him for his union activity and that his transfer was a violation of sections 10(a)(1) and 10(a)(2) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1), (a)(2) (West 2016)). The Board's Administrative Law Judge (ALJ) found that Officer Parker's transfer violated the Act, but the Board rejected the ALJ's findings. Officer Parker then filed a petition for direct administrative review of the Board's decision.

¶ 3    On appeal, Officer Parker challenges the Board's conclusion that he failed to set forth *prima facie* violations of sections 10(a)(1) or (a)(2) of the Act. In addition, Officer Parker argues that the Board's reliance on the evidence pertaining to the Department of Justice's "intense scrutiny" was against the manifest weight of the evidence. He further asserts that the Board's application of the law to this finding was clearly erroneous.  For the following reasons, we affirm.

¶ 4                                    BACKGROUND

¶ 5    Officer Parker was employed by the County and the Sheriff. The Sheriff operates the Cook County Department of Corrections, which operates the Cook County Jail (Jail). Officer Parker worked as a correctional officer at the Jail.

¶ 6                                   Jail Operations

¶ 7    The Jail comprises several divisions. In 2016, each division operated under the following chain of command in ascending order: correctional officer, sergeant, lieutenant, commander, and

superintendent. The superintendent in turn would receive orders from the chief of staff from the Department of Corrections.

¶ 8    In 2016, Officer Parker worked in Division 6 as a correctional officer. Joseph Hurd was a lieutenant in Division 6 and was Officer Parker's direct supervisor. Bernessa Tate was commander of Division 6, Sean Julian was the superintendent of Division 6, and Matthew Burke was chief of staff.

¶ 9    Division 6 houses inmates, and the correctional officers in that division interact with them. Correctional officers may, however, work in other divisions which do not house inmates; these divisions include the Warehouse Division and External Operations Division.

¶ 10                    Collective Bargaining Agreement

¶ 11    The International Brotherhood of Teamsters, Local Union No. 700 (Union), entered into a collective bargaining agreement with the County and Sheriff. The agreement was effective from 2012 to 2017. Under the agreement, the Union represented the correctional officers employed by the Sheriff. Officer Parker was a union steward from approximately 2004 to 2018.

¶ 12              Officer Parker's Reported Use of Force and Division Transfer

¶ 13    In an incident report completed by Lieutenant Hurd, he stated that on July 20, 2016, Officer Parker, Lieutenant Hurd, and several other employees were escorting a handcuffed inmate and were transporting him on a freight elevator. While on the elevator, the inmate charged at Officer Parker. Lieutenant Hurd reported that Officer Parker pushed the inmate against the elevator wall and placed his hand on the inmate's "chest, head & side of his neck area."

¶ 14    The record indicates that on the same day, Lieutenant Hurd prior to completing his incident report informed Commander Tate of the alleged use of force.  Commander Tate also on

the same day filed a complaint against Officer Parker, and Superintendent Julian emailed the complaint to Burke. Nowhere in the complaint was there an indication that Officer Parker should be transferred from Division 6. Burke responded approximately 20 minutes later, ordering that Officer Parker be transferred from Division 6 to the Warehouse Division.

¶ 15                              Charge and Complaint for Hearing

¶ 16    Officer Parker filed an unfair labor practice charge against the County and Sheriff, and subsequently an amended charge, with the Board. In response to Officer Parker's amended charge, the Board's Executive Director issued a complaint, which stated that a hearing would take place before the Board's ALJ. Thereafter, the Board issued an amended complaint, which included Officer Parker's allegations that in July 2016, "Julian and/or Tate orchestrated [Officer Parker's] removal from Division 6." In addition, the amended complaint alleged that Commander Tate "interfered with, restrained, or coerced" Parker in the exercise of his rights as a union steward. Further, the amended complaint alleged that Officer Parker lost overtime earnings and was removed as union steward since the County and Sheriff transferred him.

¶ 17                              Hearing

¶ 18    The parties proceeded to a three-day hearing. In opening arguments, Officer Parker's attorney argued that Officer Parker's transfer was evidence of antiunion animus and violated sections 10(a)(1) and 10(a)(2) of the Act. Officer Parker's attorney requested as relief $17,000 in lost overtime pay. In the Sheriff's opening argument, the Sheriff's attorney argued that the Sheriff did not reassign Parker due to his union activity and asked the ALJ to deny Officer Parker's requested relief.

¶ 19    Officer Parker testified that the Department of Corrections employed him as a correctional officer and that he had worked in Division 6 from approximately 2000 to 2016. He

stated that, as a Division 6 correctional officer, he worked as a "tier officer." He further explained that "tiers" were units in which inmates were housed, and as a tier officer, he had regular contact with inmates and fellow officers.

¶ 20    Officer Parker testified that he also served as union steward from approximately 2004 to 2018. He testified that, as steward, he was to ensure that officers were adequately represented, meet with supervisory staff, and hold shift meetings to discuss officers' concerns and issues.

¶ 21    Officer Parker testified that in July 2016, he was placed on "no-inmate contact" and transferred from Division 6 to the Warehouse Division. Then, in August 2016, he was transferred from the Warehouse Division to the External Operations Division. As to his reported use of force, Officer Parker denied choking an inmate and asserted that Commander Tate had no basis to file a complaint against him. Officer Parker also asserted that the Jail allowed him to work overtime in Division 6, but he was not allowed to do so in the Warehouse Division or External Operations Division.

¶ 22    On the second day of the hearing, Officer Parker called Sean Michalczewski as a witness, who testified that in 2016 he was a correctional officer in Division 6. Officer Michalczewski also testified that while in Division 6, he was involved in a use-of-force incident. He testified that before the incident, he was a tier officer, but after the incident, he was placed on no-inmate contact and assigned to work in the lobby. He further testified that he remained in Division 6.

¶ 23    On cross-examination, Officer Michalczewski testified that he knew employees who were transferred to the Warehouse Division after reported uses of force. He asserted that Officer Enrique Maiza and Officer Ortiz[1] were transferred out of their divisions to the Warehouse

---

[1] Officer Ortiz's first name does not appear in the record.

Division.

¶ 24　Officer Parker next called as a witness Willie Ezell, who testified that he was a correctional officer in Division 6. Officer Ezell testified that he was placed on no-inmate contact after a reported use of force but was not transferred out of Division 6.

¶ 25　On the third and final day of the hearing, the County and Sheriff had admitted into evidence the collective bargaining agreement between the Union and the County and Sheriff. The agreement stated that the County and Sheriff could "at its discretion, reassign any employee while investigation of possible wrongful behavior is completed" and that "[s]uch assignment shall not be precedent setting."

¶ 26　The County and Sheriff called Superintendent Julian as a witness. Superintendent Julian testified that he was superintendent of Division 6 in July 2016. He asserted that as superintendent, he was head of the division's staff and that Commander Tate reported to him. Superintendent Julian further testified as to how the Department of Corrections reviewed reported uses of force. He stated that when a use-of-force incident occurs, the commander must submit a thorough report of the incident to the superintendent. He also asserted that commanders must submit these reports even if they did not witness the incident.

¶ 27　The County and Sheriff also called as a witness Joseph Hurd, who testified that in 2016, he was a lieutenant in Division 6. The County and Sheriff then presented Lieutenant Hurd's incident report of Officer Parker's alleged use of force. As to the incident, Lieutenant Hurd testified that he had to push Parker away from the inmate to prevent any injuries to him or the staff. Lieutenant Hurd testified that grabbing a handcuffed inmate's neck was a use of force and "probably unnecessary." Lieutenant Hurd further testified that Parker was transferred out of Division 6 after the incident and that several officers, including Officer Antoine Malone and

Officer McCray,[2] were also transferred out of their divisions after reported uses of force.

¶ 28    The County and Sheriff then called as a witness Matthew Burke. Burke testified that in 2016, he was the Department of Corrections' chief of staff. Burke testified that he was responsible for ensuring that the Department of Corrections complied with the United States Department of Justice's consent decree, which required the Department of Corrections to improve the Jail's conditions and operations.

¶ 29    Burke further testified that in 2016, the Sheriff followed Article U of the Sheriff's Employment Action Manual, which was a policy for when the Sheriff transferred an employee during an investigation.

¶ 30    Burke testified that he learned about Officer Parker's use of force after Commander Tate filed a complaint register against Officer Parker and Superintendent Julian emailed the complaint to him. The County and Sheriff then introduced a memorandum regarding Officer Parker's reported use of force from the Sheriff's Use of Force Review Unit. Burke explained that the Use of Force Review Unit issues memoranda providing basic information about reported uses of force and classifies them as Level I, II, or III. Burke further explained that Level I was the least serious use of force and Level III was the most serious. Burke testified that in its memorandum, the Use of Force Review Unit classified Parker's use of force as Level III.

¶ 31    Burke testified that when deciding to transfer Officer Parker to the Warehouse Division, Burke relied solely on the complaint supplied by Commander Tate. Burke further testified that he transferred Parker because of the "[t]he seriousness of the allegations," the fact that Officer Parker's direct supervisor made the allegations against him, and the fact that the inmate was handcuffed during the alleged use of force. Burke asserted that he had transferred several

---

[2] Officer McCray's first name does not appear in the record.

employees, including Officer Tabas Jackson, to the Warehouse Division after learning about their reported uses of force.

¶ 32    On cross-examination, Burke testified that on the same day as Officer Parker's reported use of force, Commander Tate filed a complaint register against Officer Parker. Burke then testified that Superintendent Julian emailed the complaint to him on July 20, 2016, at 12:47 p.m. Burke further testified that he responded at 1:08 p.m., asking Superintendent Julian to transfer Officer Parker to the Warehouse Division. In addition, as to Lieutenant Hurd's incident report, Burke acknowledged that it stated, "Run Date: 7/21/2016 1:43 PM."

¶ 33    On redirect examination, Burke explained how uses of force were usually communicated to him: "When there's a problematic use of force, *** then there are a few different mechanisms for that to get brought to the attention of jail leadership." Burke continued, "One method, as in this case, would be the supervisor, either the commander but more frequently the superintendent, generating a Complaint. The Use of Force Review Unit might also notify leadership that they have concerns about a use of force incident." Burke testified that "there was a push to get direct supervisors, such as sergeants or lieutenants or commanders, to be more proactive about identifying and taking corrective action when they witnessed or became aware of *** inappropriate use of force."

¶ 34    Burke acknowledged that Lieutenant Hurd directly informed Commander Tate regarding Officer Parker's use of force, and he testified that a lieutenant or direct supervisor immediately reporting an officer's use of force was "somewhat unusual." Burke asserted that even if Commander Tate had not submitted a complaint register, the Use of Force Review Unit still would have reviewed the incident. Burke stated that the Use of Force Review Unit reviewed all uses of force.

¶ 35    Burke further testified that during 2016, "there was a concerted effort to ensure that the Department [of Corrections] was acting swiftly when allegations, particularly somewhat substantiated allegations, of excessive force were brought to light." In addition, Burke testified that in 2016, uses of force and reporting of uses of force in the Department of Corrections were under "intense scrutiny" by the Department of Justice.

¶ 36                    The Administrative Law Judge's Decision

¶ 37    In a written decision, the ALJ noted that the County and Sheriff asserted they transferred Officer Parker because of the "seriousness of the allegations" that he choked a handcuffed inmate. The ALJ found that this proffered business reason was legitimate. The ALJ found, however, that the County and Sheriff failed to prove by a preponderance of the evidence that they would have transferred Officer Parker out of Division 6 despite his union activity.

¶ 38    The ALJ reasoned that the County's and Sheriff's proffered reason was inconsistent with several of their actions. First, the ALJ noted that the Sheriff did not transfer Officers Michalczewski or Ezell out of Division 6 even though both had reported uses of force. In addition, the ALJ noted Burke's testimony that a lieutenant or direct supervisor immediately reporting an officer's use of force was "somewhat unusual." Further, the ALJ found notable that Lieutenant Hurd had not completed his incident report before Superintendent Julian emailed Commander Tate's complaint to Burke. The ALJ concluded that the County and Sheriff failed to prove by a preponderance of the evidence that they would have transferred Officer Parker out of Division 6 despite his union activity, and thus, the County and Sheriff violated sections 10(a)(1) and 10(a)(2) of the Act.

¶ 39                    The County and Sheriff's Exceptions

¶ 40    The County and Sheriff filed exceptions to the ALJ's decision. The County and Sheriff

first argued that Officer Parker's transfer was not improper. They asserted that the ALJ took out of context Burke's testimony that a lieutenant or direct supervisor immediately reporting an officer's use of force was "somewhat unusual." In addition, the County and Sheriff noted that, under the collective bargaining agreement, they had wide discretion to reassign employees under investigation. Moreover, the County and Sheriff asserted that the ALJ failed to consider the evidence of employees transferred out of their divisions after reported uses of force.

¶ 41     The County and Sheriff also contended that only Burke decided to transfer Officer Parker and that there was no evidence that Burke had antiunion animus. The County and Sheriff further contended that the ALJ improperly imputed antiunion animus to Burke because he would have eventually learned about the incident even if Commander Tate and Superintendent Julian had not been involved.

¶ 42                          The Board's Decision

¶ 43     In a written decision, the Board rejected the ALJ's finding that the County and Sheriff violated the Act when it transferred Officer Parker. The Board found that Officer Parker failed to prove that the County and Sheriff had an antiunion motivation when they transferred him and therefore, Officer Parker failed to set forth *prima facie* violations of sections 10(a)(1) or 10(a)(2) of the Act.

¶ 44     In determining that Officer Parker failed to prove antiunion motivation, the Board relied on the following findings of fact. First, the Board found that Burke, who made the decision to transfer Officer Parker, did not demonstrate antiunion motivation. The Board determined that the ALJ improperly imputed antiunion motivation from Commander Tate to Burke. The Board observed that, to impute antiunion motivation, the charging party must demonstrate that the "complained-of action" would not have reached the decision maker but for the motivation. The

Board then found that, even though Burke testified that a lieutenant or direct supervisor immediately reporting an officer's use of force was "somewhat unusual," Officer Parker's reported use of force "would have eventually reached Burke" regardless of whether Lieutenant Hurd informed Commander Tate.

¶ 45    Second, the Board found that the County and Sheriff's reason for transferring Officer Parker was not inconsistent with their other actions and that they consistently applied the Article U transfer policy. In support, the Board noted that the ALJ failed to consider the evidence of officers who were transferred out of their division after reported uses of force. Further, the Board found that the County and Sheriff did not treat Officer Parker improperly when compared to Officers Michalczewski and Ezell. The Board acknowledged that these officers were not transferred out of Division 6 and Officer Parker was transferred, but the Board determined that these procedural differences were proper since the collective bargaining agreement provided the County and Sheriff wide discretion to reassign officers under investigation.

¶ 46    The Board concluded that even if Officer Parker had set forth *prima facie* violations of the Act, his claims nevertheless failed. The Board rejected the ALJ's finding that there was no evidence the County and Sheriff would have transferred Officer Parker despite his union activity. In support, the Board noted the evidence that the Department of Justice had placed intense scrutiny on the Department of Corrections. Thus, the Board concluded that Parker's transfer did not violate sections 10(a)(1) or (a)(2) of the Act.

¶ 47    Thereafter, Parker filed a petition for direct administrative review pursuant to section 11(e) of the Act (5 ILCS 315/11(e) (West 2020)) and Illinois Supreme Court Rule 335 (eff. July 1, 2017).

¶ 48                                    ANALYSIS

¶ 49    On direct administrative review, Officer Parker challenges the Board's conclusion that he

failed to set forth *prima facie* violations of sections 10(a)(1) or (a)(2) of the Act. In addition,

Officer Parker argues that the Board's reliance on evidence of the Department of Justice's

"intense scrutiny" was against the manifest weight of the evidence and that the Board's

application of the law to this finding was clearly erroneous.

¶ 50                         Officer Parker's Statement of Facts

¶ 51    Before we turn to the merits of Officer Parker's contentions, we first address the Board's

argument that Officer Parker's opening brief violates Illinois Supreme Court Rule 341(h)(6) (eff.

Oct. 1, 2020). Specifically, the Board asserts that Officer Parker's statement of facts is

incomplete and argumentative.

¶ 52    In Officer Parker's reply brief, he acknowledges that his statement of facts contains

arguments. Since "none of the violations of the rules are so flagrant as to hinder or preclude

review," we decline to strike Officer Parker's statement of facts. See *Spangenberg v. Verner*, 321

Ill. App. 3d 429, 432 (2001). We will, however, disregard any inappropriate statements. See *id.*

¶ 53                                  Legal Framework

¶ 54    We now turn to Officer Parker's contentions that the Board erred when it concluded that

Officer Parker failed to set forth *prima facie* violations of the Act. Under section 10(a)(1) of the

Act, employers commit an unfair labor practice when they "interfere with, restrain or coerce

public employees in the exercise of rights guaranteed [under the Act]." 5 ILCS 315/10(a)(1)

(West 2016). Further, under section 10(a)(2) of the Act, employers commit an unfair labor

practice when they "discriminate in regard to hire or tenure of employment or any term or

condition of employment in order to encourage or discourage membership in or other support for

any labor organization." *Id.* § 10(a)(2). When an employee alleges that an employer's adverse employment action was retaliation for the employee's union activity, and that the employer violated sections 10(a)(1) and (a)(2) of the Act, then "the alleged section 10(a)(1) violation is derivative of the section 10(a)(2) violation, and the Board follows the framework applied to section 10(a)(2) claims ***." *Slater v. Illinois Labor Relations Board, Local Panel*, 2019 IL App (1st) 181007, ¶ 17.

¶ 55    To set forth a *prima facie* violation of section 10(a)(2), employees must demonstrate that (1) they engaged in union activity, (2) their employer knew of the activity, (3) their employer had antiunion motivation toward the activity, and (4) their employer issued an adverse employment action against them. *Id.* The Board may infer antiunion motivation from direct or circumstantial evidence. *City of Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345 (1989). Further, the Board may infer antiunion motivation from several circumstances, including that (1) a short amount of time passed between the employee's union activity and the adverse action, (2) the employer disparately treated employees who were union supporters, and (3) the employer's proffered reason for the adverse action was inconsistent with the employer's actions. *Id.* at 346.

¶ 56    If an employee sets forth a *prima facie* violation, then the burden shifts to the employer, who must demonstrate that it took the adverse action against the employee for legitimate business reasons. *Pace Suburban Bus Division of Regional Transportation Authority v. Illinois Labor Relations Board*, 406 Ill. App. 3d 484, 500 (2010). If the Board finds that the employer's advanced reason is legitimate and that the employer relied on that reason, then the case is a "dual motive case," and the employer must then prove by a preponderance of the evidence that it would have taken the adverse action despite the employee's union activity. *Id.*

¶ 57                                   Standard of Review

¶ 58     We review the Board's decision, not the ALJ's findings. *Danigeles v. Illinois Department of Financial and Professional Regulation*, 2015 IL App (1st) 142622, ¶ 69. When reviewing an agency's decision, the standard of review we apply depends on whether an issue involves a question of fact, law, or both. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001).

¶ 59     When an issue involves a question of fact, we review it under a manifest weight of the evidence standard. *Lipscomb v. Housing Authority of County of Cook*, 2015 IL App (1st) 142793, ¶ 14. Under this deferential standard of review, we must presume an agency's findings of fact are correct unless the opposite conclusion is clearly evident. *Gaston v. CHAC, Inc.*, 375 Ill. App. 3d 16, 23 (2007). Thus, "so long as the record contains evidence supporting the agency's decision, it should be affirmed." *Mercy Crystal Lake Hospital & Medical Center v. Illinois Health Facilities & Service Review Board*, 2016 IL App (3d) 130947, ¶ 17. When an issue involves a question of law, we review it *de novo*, which means we perform the same analysis that a circuit court would perform. *Elam v. O'Connor & Nakos, Ltd.*, 2019 IL App (1st) 181123, ¶ 23.

¶ 60     When an issue requires a reviewing court to examine the legal effect arising from a set of facts, that issue involves a mixed question of fact and law. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008). We may reverse an agency's decision on a mixed question of fact and law only if the decision is clearly erroneous. *Id.* A decision is clearly erroneous if it leaves the reviewing court with the definite and firm conviction that a mistake has been made. *Id.*

¶ 61     The Board's ultimate conclusion as to whether an employer committed an unfair labor practice is a mixed question of fact and law, and thus, we review this determination for clear

error. *Slater*, 2019 IL App (1st) 181007, ¶ 14. We review the Board's underlying findings of fact, however, under the manifest weight of the evidence standard. *Id.* Thus, the findings of fact that the Board relies on to determine whether an employer had antiunion motivation are reviewed under the manifest weight of the evidence standard. See *City of Burbank*, 128 Ill. 2d at 345; *Slater*, 2019 IL App (1st) 181007, ¶¶ 14, 17.

¶ 62                                  Officer Parker's *Prima Facie* Case

¶ 63    Officer Parker challenges the Board's conclusion that he failed to set forth *prima facie* violations of sections 10(a)(1) or (a)(2) of the Act.

¶ 64    As stated above, to set forth a *prima facie* violation of section 10(a)(2) of the Act, an employee must prove that his or her employer had an antiunion motivation. *City of Burbank*, 128 Ill. 2d at 345. Also, the findings of fact that the Board relies on to determine whether an employer had antiunion motivation are reviewed under the manifest weight of the evidence standard; thus, we may not reverse these findings of fact "unless the opposite conclusion is clearly evident." *City of Burbank*, 128 Ill. 2d at 345; *Slater*, 2019 IL App (1st) 181007, ¶¶ 14, 17; *Gaston*, 375 Ill. App. 3d at 23. Moreover, we may not reverse these findings of fact if "the record contains evidence supporting the agency's decision." *Mercy Crystal Lake Hospital & Medical Center*, 2016 IL App (3d) 130947, ¶ 17.

¶ 65    The Board relied on the following findings of fact to determine that Parker had not proved that the County and Sheriff had an antiunion motivation.

¶ 66                                    *Burke's Motivation*

¶ 67    First, the Board determined that Burke did not demonstrate antiunion motivation, finding that the ALJ improperly imputed antiunion motivation to Burke since Officer Parker's reported use of force "would have eventually reached Burke"—despite Burke testifying that Lieutenant

Hurd immediately informing Commander Tate was "somewhat unusual."

¶ 68    Officer Parker contends that the Board's conclusion that his reported use of force "would have eventually reached Burke" was against the manifest weight of the evidence. He argues that the evidence that Officers Michalczewski and Ezell were not transferred, and Officer Parker was transferred, demonstrates that his reported use of force would not have reached Burke but for an antiunion motivation. Officer Parker further argues that Burke's testimony that Lieutenant Hurd immediately informing Commander Tate was "somewhat unusual" further demonstrates that Officer Parker's reported use of force would not have reached Burke.

¶ 69    We conclude the Board's finding of fact that Officer Parker's reported use of force "would have eventually reached Burke" was not against the manifest weight of the evidence. The record demonstrates that Lieutenant Hurd filed an incident report describing Officer Parker's use of force. Also, Burke testified that even if Commander Tate had not submitted a complaint, the Use of Force Review Unit still would have reviewed the incident and that the Unit reviews all reported uses of force. In addition, the Use of Force Review Unit classified Officer Parker's use of force as "Level III," which Burke testified was the "most serious" use of force. Finally, Burke asserted that when there is "a problematic use of force," the Use of Force Review Unit could directly notify Jail leadership that they have concerns regarding a use of force.

¶ 70    Thus, the record contains evidence that the Use of Force Review Unit would have reported Officer Parker's Level III use of force to Jail leadership and that the use of force "would have eventually reached Burke" even if Lieutenant Hurd had not immediately reported it to Commander Tate. See *Mercy Crystal Lake Hospital & Medical Center*, 2016 IL App (3d) 130947, ¶ 17. The fact that the County and Sheriff did not transfer Officers Michalczewski and Ezell does not contradict the Board's conclusion; these officers were both assigned to "no

contact" positions, and Officer Ezell was assigned to work in the lobby. Thus, we conclude that this finding is not against the manifest weight of the evidence. See *Lipscomb*, 2015 IL App (1st) 142793, ¶ 14; *Gaston*, 375 Ill. App. 3d at 23.

¶ 71                                   *The Transfer Policy*

¶ 72    The Board also relied on its finding of fact that the County and Sheriff consistently applied the Article U transfer policy. In support, the Board noted that the ALJ failed to consider the evidence of officers who were transferred out of their division after reported uses of force. Further, the Board found that the County and Sheriff did not treat Officer Parker improperly when compared to Officers Michalczewski and Ezell. Although these officers were assigned "no contact" positions but ultimately not transferred out of Division 6, the Board found that these procedural differences were proper since the collective bargaining agreement provided the County and Sheriff wide discretion to reassign officers under investigation.

¶ 73    Officer Parker contends that the Board's finding that the County and Sheriff consistently applied the Article U transfer policy was against the manifest weight of the evidence. He contends the fact that Officers Michalczewski or Ezell were not transferred demonstrates that the County and Sheriff did not consistently apply their transfer policy. Further, Officer Parker contends that the Board exceeded its authority by interpreting the collective bargaining agreement.

¶ 74    We conclude that the Board's finding that the County and Sheriff consistently applied the Article U transfer policy was not against the manifest weight of the evidence. The record demonstrates that, even though the Department of Corrections did not transfer Officers Michalczewski or Ezell, it had transferred several officers out of their divisions after reported uses of force. First, Officer Michalczewski testified that he knew employees who were

transferred to the Warehouse Division after reported uses of force. Specifically, he asserted that Officers Maiza and Ortiz were transferred out of their divisions to the Warehouse Division. Also, Lieutenant Hurd testified that several officers, including Officers Malone and McCray, were transferred out of their divisions after reported uses of force. Finally, Burke testified that he had transferred several employees, including Officer Tabas Jackson, to the Warehouse Division after learning about their reported uses of force.

¶ 75    In addition, the record supports that the Board had wide discretion to reassign officers under investigation. Under the collective bargaining agreement, the County and Sheriff could "at its discretion, reassign any employee while investigation of possible wrongful behavior is completed" and that "[s]uch assignment shall not be precedent setting."

¶ 76    Thus, the record contains substantial evidence that the County and Sheriff applied their transfer policy consistently. See *Mercy Crystal Lake Hospital & Medical Center*, 2016 IL App (3d) 130947, ¶ 17. Again, the fact that the County and Sheriff did not transfer Officers Michalczewski or Ezell does not contradict the Board's conclusion. Thus, we find that it is not against the manifest weight of the evidence. See *Lipscomb*, 2015 IL App (1st) 142793, ¶ 14; *Gaston*, 375 Ill. App. 3d at 23.

¶ 77    We have also considered the authority that Officer Parker cites for his contention that the Board exceeded its authority by interpreting the collective bargaining agreement. See *Amalgamated Transit Union, Local 1028 & PACE Fox Valley Division*, 37 PERI ¶ 109 (ILRB State Panel 2021); *McGreal & Village of Orland Park*, 30 PERI ¶ 28 (ILRB State Panel 2013); *Fletcher & Village of Creve Coeur*, 4 PERI ¶ 2002 (ISLRB 1987); *Fletcher & Village of Creve Coeur*, 3 PERI ¶ 2063 (ISLRB 1987). The Board, however, did not interpret the collective bargaining agreement; the Board merely relied on the agreement's plain language as evidence.

None of Officer Parker's cited authority supports the contention that the Board may not rely on the agreement's plain language as evidence. See *Amalgamated Transit Union, Local 1028*, 37 PERI ¶ 109; *McGreal*, 30 PERI ¶ 28; *Fletcher*, 4 PERI ¶ 2002; *Fletcher*, 3 PERI ¶ 2063. Thus, this argument fails.

¶ 78    Because we have found that the Board's findings of fact that the County and Sheriff did not demonstrate antiunion motivation were not against the manifest weight of the evidence, we find it was not clearly erroneous for the Board to conclude that Officer Parker failed to set forth *prima facie* violations of sections 10(a)(1) or (a)(2) of the Act. See *City of Burbank*, 128 Ill. 2d at 345; *Slater*, 2019 IL App (1st) 181007, ¶ 14. We cannot say that the Board's conclusion leaves this court with the definite and firm conviction that a mistake has been made. See *Cinkus*, 228 Ill. 2d at 211 (2008).

¶ 79                              The Department of Justice

¶ 80    In support of its ultimate conclusion that the County and Sheriff would have transferred Officer Parker despite his union activity, the Board relied on its finding of fact that the Department of Corrections was under "intense scrutiny" by the Department of Justice. Officer Parker contends that this finding of fact was against the manifest weight of the evidence. Officer Parker further contends that the Board's application of the law to this finding was clearly erroneous.

¶ 81    First, whether an employer would have transferred an employee despite his or her union activity is an inquiry reached only after the Board determines that an employee has set forth a *prima facie* violation. *Pace Suburban Bus Division of Regional Transportation Authority*, 406 Ill. App. 3d at 500. Since we have affirmed the Board's decision that Officer Parker failed to set forth *prima facie* violations of sections 10(a)(1) or (a)(2) under the Act, we need not address

Officer Parker's challenges as to the "intense scrutiny" of the Department of Justice. See *id.*

¶ 82      Even if we were to find that the Board erred in determining that Officer Parker failed to set forth *prima facie* violations, his arguments regarding the "intense scrutiny" of the Department of Justice nevertheless fail. As stated above, the Board's ultimate conclusion as to whether an employer committed an unfair labor practice is a mixed question of fact and law, and we review this determination for clear error. *Slater*, 2019 IL App (1st) 181007, ¶ 14. Further, we review the Board's underlying findings of fact under the manifest weight of the evidence standard. *Id.*

¶ 83      In the case at bar, the record contains evidence that the Department of Corrections was under "intense scrutiny." At the hearing, Burke testified that during 2016, "there was a concerted effort to ensure that the Department [of Corrections] was acting swiftly when allegations, particularly somewhat substantiated allegations, of excessive force were brought to light." Burke also testified that in 2016, uses of force and reporting of uses of force in the Department of Corrections were under "intense scrutiny" by the Department of Justice.

¶ 84      The record supports the Board's finding that the Department of Corrections was under "intense scrutiny." Therefore, we find that it is not against the manifest weight of the evidence. See *Mercy Crystal Lake Hospital & Medical Center*, 2016 IL App (3d) 130947, ¶ 17; *Lipscomb*, 2015 IL App (1st) 142793, ¶ 14; *Gaston*, 375 Ill. App. 3d at 23.

¶ 85      Further, since the record supports the Board's factual findings underlying the Board's ultimate conclusion that the County and Sheriff would have transferred Officer Parker despite his union activity, we cannot say this conclusion leaves this court with the definite and firm conviction that a mistake has been made. See *Cinkus*, 228 Ill. 2d at 211 (2008). Thus, we find that the Board's conclusion was not clearly erroneous. See *id.*

¶ 86                                    CONCLUSION

¶ 87     For the reasons stated above, we affirm the Local Panel of the Illinois Labor Relations

Board's decision.

¶ 88     Affirmed.