2024 IL App (1st) 231106-U

THIRD DIVISION
November 27, 2024

No. 1-23-1106

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

# IN THE
# APPELLATE COURT OF ILLINOIS
# FIRST JUDICIAL DISTRICT

| | |
|---|---|
| DENISE BROOKS, | ) Petition for Administrative |
| | ) Review of the Final |
| Petitioner-Appellant, | ) Decision of the Illinois |
| | ) Public Labor Relations |
| v. | ) Board |
| | ) |
| ILLINOIS LABOR RELATIONS BOARD, LOCAL PANEL | ) No. L-CA-14 040 |
| and CHICAGO TRANSIT AUTHORITY, | ) |
| | ) |
| Respondents-Appellees. | ) |

JUSTICE D. B. WALKER delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred with the judgment.

## ORDER

¶ 1    *Held*: We affirm the decision of the Illinois Labor Relations Board to dismiss petitioner's unfair labor practice complaint where petitioner did not establish that she suffered an adverse employment action, and the Board did not violate due process when it rendered its decision.

¶ 2    Petitioner Denise Brooks appeals the decision of the Illinois Labor Relations Board (Board)

to dismiss her unfair labor practice charge against respondent Chicago Transit Authority (CTA).[1]

---

[1] Petitioner appealed the Board's decision directly to this court pursuant to section 11(e) of the Illinois Public Labor Relations Act (5 ILCS 315/11(e) (West 2022)).

On appeal, Brooks contends that her claim should not have been dismissed where the evidence showed that after she took disability leave, CTA refused to reinstate her as a payroll processing clerk because she had engaged in protected activities. Brooks also argues that she was denied a fair hearing where the administrative law judge who conducted the hearing was not the same judge who decided her case. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The following is a summary of the relevant evidence and testimony taken from the proceedings in this matter.

¶ 5     Brooks began working for the CTA in 1988 as a part-time bus operator. In October 2002, she moved to the full-time position of payroll processing clerk. At the time, there were approximately 10-15 payroll processing clerks who performed their duties manually using "pencil and paper." She reported to Linda Davis, CTA's senior payroll manager. Davis, in turn, reported to Karen London, the general manager of payroll operations. As a payroll processing clerk, Brooks became a member of the Amalgamated Transit Union, Local 241 (Union).

¶ 6     In late June or early July of 2011, Brooks submitted a request to Davis for a vacation day, providing two days' notice. Davis denied the request. The parties have different views on the circumstances surrounding the denial.

¶ 7     According to Brooks, when she asked for a reason, Davis responded only that she "said so." Since Brooks was not satisfied with the answer, they "escalate[d]" the situation to London. When Brooks asked London for a reason why her request was denied, London stated that she did not have to give a reason. The situation "became combative," and Brooks told London that she was governed by a union contract. London responded that she was denying Brooks' request

because of "manpower" and that she would not be governed by union contracts and rules. Brooks recalled:

"[A]fter Karen (London) said to me *** that she wasn't giving me the day off because she said so and she wasn't going to be governed by union rules and regulations, she said I want to be able to walk out on the floor, tap you on the shoulder and say you have a vacation tomorrow, I'm going to cancel it, I need all hands on deck. Whether you're union or exempt, I want to reserve the right to cancel days off, vacation days and holidays at my will, not be governed by [a] union contract."

¶ 8    Brooks told London that the union would "come in and explain the contract." She called her union representative, Keith Hill, who met with Brooks and other union members of the payroll department the following day. Present at that meeting were Brooks, Anna Lostaunau, Leonard Burns and Charlotte Hogan. Brooks testified that Hill also discussed the denial of Hogan's vacation request.

¶ 9    Later that day, Hill and Brooks met with London. According to Brooks, she was asked to leave London's office so that Hill and London could discuss the issue privately. Hill later called Brooks and informed her that London granted Brooks' and Hogan's requests for days off. He also told her that London thought Brooks was "a great candidate to be on her team." She understood London's comments to mean that London wanted Brooks to "step out of the union so she can fire [her.]" To join London's team as a supervisor or project manager meant that Brooks would be the first person fired. As Brooks explained, "[l]ast man hired, first man fired. That's what she wanted." Brooks thought London and Hill "had made some deal."

¶ 10    London testified, however, that she did not express any animosity towards the union or unionized workers to Brooks. She denied making the quoted statement to Brooks. Davis

corroborated London's statements. Davis also denied that she told Brooks she was rejecting her vacation request because she "said so." Hogan, the other payroll employee Brooks identified as requesting a day off, did not recall meeting with London about a canceled vacation day. She did not recall having the union involved in her vacation day requests.

¶ 11    On September 23, 2011, Brooks was injured at work. At the time, the payroll department employed five payroll processing clerks including Brooks. Brooks received worker's compensation benefits from September 23, 2011 through November 29, 2011. When the benefits ended, Brooks was unable to work. On July 16, 2012, she was placed in Area 605, which is an administrative "holding area" for union employees who cannot perform the essential functions of their jobs due to illness or injury. The Disability Review Committee determined that Brooks' medical documentation and her inability to return to work warranted placement in Area 605.

¶ 12    Area 605 allows CTA to fill the vacancy created by a union employee's medical status. The position could also remain vacant. Employees can leave Area 605 and return to work if they are deemed medically fit to return to their positions, and their positions are available, budgeted and approved for filling. A position is budgeted if CTA has allocated funds in its budget to pay for that position. Even if a position is budgeted, there must be approval from CTA's Position Control Committee to fill the position. The committee consists of representatives from the human resources and budget departments, and from the CTA president's office.

¶ 13    On November 16, 2012, while in Area 605, Brooks elected to receive a disability pension. She began receiving disability benefits on November 20, 2012. According to Katherine Lunde, CTA's labor relations director, when a person takes any form of pension, including a disability pension, he or she is no longer considered a CTA employee.

¶ 14 Michael Bowen, a director in human resources, testified that a person receiving a disability pension has no guarantee of returning to his or her former position. Rather, he or she could return to that job only if medically cleared to do so and the position is "vacant, budgeted, and approved." When a position becomes vacant, CTA follows a standard approval process to fill the vacancy. A position may be vacant, but not budgeted and approved, or vacant and budgeted, but not approved.

¶ 15 While Brooks was on medical leave in Area 605, CTA did not fill her vacant position. When three of the four remaining payroll processing employees retired in 2013 and 2014, the CTA did not fill those vacancies. According to Davis and London, the department's workload decreased during this time due to automation. CTA had implemented Oracle, an employee self-service program that allowed employees to perform certain functions previously done by a payroll or human resources employee. After the three retirements and Brooks' placement in Area 605, Hogan remained the sole payroll processing clerk who performed the duties of the position. The payroll department also performed new functions. These positions required a bachelor's degree in accounting or business, or a specific combination of education and experience. Payroll processing clerks such as Brooks were not trained to perform these new functions.

¶ 16 Brooks was medically cleared to return to work on June 25, 2013. She was instructed to contact Anna Cobb, CTA's benefits compliance manager at the time, to arrange for reinstatement. When Brooks contacted Cobb, Cobb told her that she had to "check on a few things" and "hear back from" London. Cobb said she would "follow up" with Brooks but according to Brooks, Cobb never called her. Cobb testified that she reached out to London several times regarding Brooks, but she could not recall whether she received a response from London. Cobb stated that for someone to return to work from Area 605 status, they must be found medically fit and there must

be "a vacant approved budgeted position for them to return back to." If their position is no longer available, they would be placed on a waiting list.

¶ 17    After not hearing from Cobb, Brooks reached out again and discovered that Cobb no longer worked at the CTA. She was told to contact DeShone Maddox. Maddox told Brooks that London was waiting until the budget was finalized. Maddox recalled that in July 2013, London emailed her stating that "yes, we have a position" for Brooks. Maddox, however, believed that Brooks did not return to work because a processing clerk position was not available for her.

¶ 18    London testified that someone contacted her in 2013 about Brooks returning to work. London exchanged emails with Lunde and spoke to her about Brooks returning to payroll. According to London, Lunde "offered [Brooks] a position to return to work." London was present when Lunde offered the job to Brooks. London testified that Brooks "didn't want the job."

¶ 19    London explained that the payroll department did not need another processing clerk other than Hogan to function. After three of the former processing clerks retired, they did not fill those positions because they "didn't have the work to support it." London stated that the budget department "eliminated the vacancy." She could not reinstate Brooks as a payroll processing clerk without a vacancy.

¶ 20    In September 2013, Brooks filed a grievance with the union alleging that CTA violated the collective bargaining agreement when it refused to reinstate her by "bumping" Hogan, a less senior employee, from the payroll processing clerk position. Brad Jansen, CTA's labor relations deputy, responded that bumping rights are available only when an employee has been laid off, or the job has been abolished. The grievance proceeded to an arbitration hearing.

¶ 21    After the hearing, the arbitrator denied Brooks' grievance in its entirety. Construing the clear terms of the bumping provision, the arbitrator determined that the provision "does not come

into play any time the number of employees in a job classification is reduced; there must be an accompanying layoff or job abolishment to trigger bumping rights afforded" under the provision. In the Matter of the Arbitration between Chicago Transit Authority and Amalgamated Transit Union, Local 241, Grievant Denise Brooks at 20 (Opinion and Award July 2016). Brooks never received a notice from CTA that she was being laid off or that her position was being abolished. Instead, Brooks left her employment because she "voluntarily elected to take a disability pension." *Id*. at 22.

¶ 22    The arbitrator also noted that when Brooks began receiving the pension, her return to work as a payroll processing clerk "was dependent not only on CTA's medical approval but also on the existence of a valid, approved vacancy. The contingencies placed on her return to work arose from the fact that [Brooks] had been out on a disability pension, not a layoff." *Id*. at 22-23. The "mere fact that there had been voluntary attrition in the [payroll] department does not transform the circumstances into a constructive layoff." *Id*. at 23. In the absence of a layoff as contemplated by the provision, CTA "has the right to fill vacancies or leave them unfilled depending on its budget and operational needs." *Id*. at 23-24.

¶ 23    On December 12, 2013, while arbitration for her grievance was pending, Brooks filed a charge with the Board. The Board held the charge in abeyance until the arbitrator resolved Brooks' grievance. After the arbitrator denied the grievance, the Board issued a Complaint for Hearing for the charge.

¶ 24    In the charge, Brooks alleged that CTA engaged in unfair labor practices pursuant to section 10(a)(1) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1) (West 2022)) when it did not allow her to return to work as a payroll processing clerk. A hearing was held June 22-23, 2021 in front of Administrative Law Judge (ALJ) Purcell. The matter was subsequently

reassigned to ALJ Moy who issued the recommendation and order. ALJ Moy made his determination "[a]fter full consideration of the parties' stipulations, evidence, arguments, and briefs, and upon the entire record of the case."

¶ 25    ALJ Moy first addressed Brooks' requests to amend the charge. He granted her request to add a section 10(a)(2) violation. However, he denied her request to add an allegation relating to an incident that occurred on August 8, 2011, because it took place at a different time than the charged allegations and Brooks did not argue that CTA received notice of the incident.

¶ 26    In his decision, ALJ Moy noted that to prevail on her unfair labor practice claim, Brooks must show, by a preponderance of the evidence, that she engaged in protected activity, CTA knew of that activity, and CTA "took adverse action against [Brooks] as a result of her involvement in that activity." Furthermore, there is no violation of the Act if CTA can demonstrate that it would have taken adverse action for a legitimate business reason.

¶ 27    The ALJ found that Brooks established the first two elements of her prima facie case. First, she asserted the following protected activities: 1) her phone call to union representative Hill relating to London's denial of her request for a day off, 2) her meeting with Hill and London concerning the matter, 3) another conversation with Hill in early July 2011, and 4) filing a grievance in September 2013. CTA acknowledged that these activities occurred.

¶ 28    CTA, however, disputed the third element. It disagreed that Brooks was constructively discharged when she could not return to work in her previous position in 2013. CTA also argued that a legitimate business reason existed for its actions.

¶ 29    The ALJ determined that Brooks failed to show that her engagement in protected activities was "a substantial and motivating factor" in the CTA's decision not to reinstate her as a payroll processing clerk. He found that CTA's Position Control Committee made that decision based on

the continuing automation of the payroll department and the decreased need for processing clerks as a result. The ALJ further determined that London "was not the ultimate decisionmaker on any vacancy," where there was insufficient evidence that London had control over whether to submit Brooks' vacancy to the committee. He also found insufficient evidence showing hostility towards union activity or disparate treatment of union employees compared to non-union employees who elected to receive a disability pension.

¶ 30    The ALJ found no evidence that CTA provided inconsistent or shifting explanations for its decision not to return Brooks to her former job, or evidence of nonsensical rationales or debunked testimony. Rather, CTA's explanation was consistent that no processing clerk position was available for Brooks because none had been budgeted and approved. The ALJ also found "notable" that in the 11 weeks between Brooks' protected activities and her injury, "there were no alleged adverse actions." Since Brooks did not prove her case, the ALJ ruled that the absence of a budgeted and approved payroll processing clerk position for Brooks "was non-pretextual." Therefore, he found no violation of sections 10(a)(1) or (a)(2) of the Act and dismissed the complaint. Brooks filed exceptions to the ALJ's decision with the Board.

¶ 31    On May 17, 2023, the Board issued its decision and order after "review of the record, the [ALJ's recommended decision and order], [and] the exceptions and responses thereto."

¶ 32    The Board first addressed Brooks' contention that she was denied a fair hearing because ALJ Purcell presided over the hearings, but ALJ Moy made the credibility determinations and ruled on the charge. Citing *Starkey v. Civil Service Commission*, 97 Ill. 2d 91 (1983) and *Homefinders, Inc. v. City of Evanston*, 65 Ill. 2d 115 (1976), the Board rejected her contention. The Board found that, pursuant to supreme court precedent, it was not necessary that testimony in administrative proceedings be heard by the same officer who ultimately decides the case absent

statutory authority to the contrary. The Board found that the Act contained no such limitation. The Board also noted that, regardless of who presided over the hearings, the Board retained the authority to review credibility determinations when deciding a case.

¶ 33 On the merits of the charge, the Board found insufficient circumstantial evidence showing that CTA refused to reinstate Brooks to her former position due to her protected activity, or that it was hostile towards the protected activity. The Board found that Brooks did not provide any evidence to support her contention that London purposely failed to submit her job to position control for approval, or that London intentionally "held back" the position so she could fill it with non-union employees. The Board therefore rejected Brooks' exceptions and adopted the ALJ's findings and his recommendation to dismiss the complaint.

¶ 34 Brooks filed a direct appeal to this court pursuant to section 11(e) of the Act (5 ILCS 315/11(e) (West 2022)).

¶ 35                                                    II. ANALYSIS

¶ 36 Review of the Board's determination is governed by Administrative Review Law. *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board*, 216 Ill. 2d 569, 577 (2005). On administrative review, our standard of review depends on whether the issue involves a question of law, a question of fact, or a mixed question of law and fact. *Id*. The Board's findings of fact are considered *prima facie* true, and we will not reverse the Board's fact findings unless they are against the manifest weight of the evidence. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50. A factual determination is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 37    The Board's decision on whether an unfair labor practice was committed presents a mixed question of law and fact. *Slater v. Illinois Labor Relations Board, Local Panel*, 2019 IL App (1st) 181007, ¶ 14. We will reverse Board decisions involving mixed questions of law and fact only if they are clearly erroneous. *American Federation of State, County & Municipal Employees*, 216 Ill. 2d at 577. "A decision is 'clearly erroneous' when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Id*. at 577-78. We may affirm the Board's decision on any basis supported by the record, regardless of the reason provided by the Board. *Ball v. Board of Education of the City of Chicago*, 2013 IL App (1st) 120136, ¶ 27.

¶ 38    Brooks brought charges against CTA for unfair labor practices pursuant to sections 10(a)(1) and 10 (a)(2) of the Act. Sections 10(a)(1) and (2) provide, in relevant part, that:

> " (a) It shall be an unfair labor practice for an employer or its agents:
>
> > (1) to interfere with, restrain, or coerce public employees in the exercise of the rights guaranteed in this Act or to dominate or interfere with the formation, existence or administration of any labor organization or contribute financial or other support to it; ***
> >
> > (2) to discriminate in regard to hire or tenure of employment or any term or condition of employment in order to encourage or discourage membership in or other support for any labor organization. *** " 5 ILCS 315/10(a)(1), (2) (West 2022).

¶ 39    Section 10(a)(1) provides broad protection for public employees in exercising their rights under the Act. *Pace Suburban Bus Division of Regional Transportation Authority v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 484, 496 (2010). Generally, a violation under section 10(a)(1) does not require proof that an employer acted with anti-union animus. *Id*. at 495-96. However, when a party alleges unfair labor practices under both sections 10(a)(1) and 10 (a)(2),

as Brooks does here, the section 10(a)(1) violation is derivative of the section 10(a)(2) violation. *Id*. at 494. In this situation, the Board follows the procedure applied to section 10(a)(2) violations when determining whether an employer took adverse action for an improper motive. *Id*.

¶ 40　To establish a *prima facie* violation of section 10(a)(2), the charging party must show 1) they were engaged in union or protected, concerted activity, 2) their employer knew of the activity, 3) the employer has animus toward the activity, and 4) the employer took an adverse employment action against the employee. *Slater*, 2019 IL App (1st) 181007, ¶ 17. Adverse employment action in this context consists of "some qualitative change in, or actual harm to, an employee's terms and conditions of employment." *Slater*, 2019 IL App (1st) 181007, ¶ 18. To prevail on a charge brought under either section 10(a)(1) or 10 (a)(2) of the Act, one must establish an adverse employment action taken by the employer. *Id*. ¶ 21.

¶ 41　In the proceedings below, Brooks alleged that she was constructively discharged by the CTA. The ALJ reiterated her allegation in his order. However, a claim of constructive discharge usually requires "a showing that the employer deliberately or intentionally made the employee's working conditions so intolerable that a reasonable person would have felt compelled to resign to escape the intolerable conditions." *Dudycz v. City of Chicago*, 206 Ill. App. 3d 128, 134 (1990). Brooks did not allege that intolerable working conditions compelled her to leave her employment.

¶ 42　Instead, Brooks alleged that she is no longer employed at the CTA because CTA failed to return her to her prior position of payroll processing clerk after she took medical leave. To establish a claim alleging an employer's failure to rehire or recall, an employee must first show that he or she had a reasonable expectation of being permitted to return to that employment. *Webb v. County of Cook*, 275 Ill. App. 3d 674, 676 (1995).

¶ 43    While recovering from her injury, Brooks was placed in Area 605. Employees can return to work from Area 605 placement if they are deemed medically fit to return to their positions, and their positions are available, budgeted and approved for filling. While in Area 605, Brooks elected to receive a disability pension. CTA director Bowen testified that a person receiving a disability pension has no guarantee of returning to his or her former position. He or she could return to that job only if medically cleared to do so and the position is "vacant, budgeted, and approved." In her opinion and award, the arbitrator found that because Brooks voluntarily elected to take a disability pension, her return to her job as a payroll processing clerk was dependent on medical clearance and the existence of a valid and approved vacancy.

¶ 44    When Brooks was cleared to return to work in 2013, the evidence showed that a vacant, budgeted and approved payroll processing clerk position was not available. On the contrary, the payroll department's workload decreased between the time of Brooks' injury and her return from disability leave due to planned automation. As employees retired, CTA did not fill those vacancies because the payroll department no longer had work to support those positions. When Brooks was ready to return, Hogan was the only processing clerk in the department.

¶ 45    The only adverse employment action alleged by Brooks was CTA's failure to return her to her payroll processing clerk position after she was medically cleared to work. She did not allege that CTA refused to rehire or reinstate her altogether. In fact, evidence in the record showed that CTA offered Brooks a non-specified job, but she did not accept it. Brooks could not have a reasonable expectation of returning to a job that, by all accounts, no longer existed. As such, Brooks did not establish she suffered an adverse employment action when CTA failed to rehire or reinstate her as a payroll processing clerk. See *County of Cook v. Illinois Labor Relations Board, Local Panel*, 2012 Il App (1st) 111514, ¶ 28 (noting that if an employee has no right to a certain

employment action, an employer should not be liable for failing to offer the action to the employee). Without a showing of an adverse employment action, Brooks' unfair labor practice claim cannot stand. *Slater*, 2019 IL App (1st) 181007, ¶ 18.

¶ 46     Furthermore, even if Brooks' testimony established London's hostility towards unions and union activity, the Board found no connection between London's alleged anti-union animus and CTA's decision not to reinstate Brooks as a payroll processing clerk. The Board agreed with the ALJ's conclusion that London "was not the ultimate decisionmaker on any vacancy." Witnesses testified that the Position Control Committee, which did not include London, determined whether the CTA would fill a vacancy. Testimony at the hearing indicated that CTA did not fill the payroll processing clerk vacancies that occurred between 2011 and 2013 because the department was being automated, and the workload decreased. There was also insufficient evidence showing that London refused to submit Brooks' vacancy to the committee for approval. The Board found that Brooks failed to provide any citations to the record or other evidence to support this assertion.

¶ 47     Whether CTA acted with an anti-union motive is a question of fact that may be inferred from direct or circumstantial evidence. *Pace*, 406 Ill. App. 3d at 496-97. Moreover, we take the Board's findings of fact as *prima facie* true and will not reverse the Board unless the opposite conclusion is clearly evident. *Beggs*, 2016 IL 120236, ¶ 50. Given the evidence presented, the opposite conclusion is not clearly evident. Nor are we left with the definite and firm conviction that error occurred. Therefore, the Board's determination was not clearly erroneous, and we affirm its decision.

¶ 48     Brooks' final contention is that she was denied a fair hearing on her charge where ALJ Purcell conducted the hearing, but ALJ Moy rendered the determination adopted by the Board. She contends that this procedure violated due process as well as section 1200.40 of the Illinois

Administrative Code (Code) (80 Ill. Adm. Code 1200.40). We review Brooks' claim that her procedural due process rights were violated under the *de novo* standard because it is a legal question. *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 271 (2004). Her contention also raises a question of statutory interpretation, which we review *de novo*. *Western Illinois University v. Illinois Educational Labor Relations Board*, 2021 IL 126082, ¶ 32.

¶ 49    The United States Supreme Court has long held that standard administrative procedure satisfies due process requirements. See *Anniston Manufacturing Co. v. Davis*, 301 U.S. 337, 356–57, 57 S. Ct. 816, 825, 81 L. Ed. 1143 (1937). A "hearing" before an administrative agency means "the hearing of evidence and argument." *Morgan v. United States*, 298 U.S. 468, 480–81, 56 S. Ct. 906, 911–12, 80 L. Ed. 1288 (1936). The provision for a hearing in administrative settings "implies both the privilege of introducing evidence and the duty of deciding in accordance with it." (Internal quotation marks omitted.) *Anniston*, 301 U.S. at 356. Thus, where the enabling statute requires an administrative agency to make findings and render its decision based on evidence obtained at a hearing, and the agency does so, "[w]hatever the privilege or duty of the presiding officer, and whatever may be his recommendation," the agency's determinations satisfy the demands of due process. *Id.* at 357.

¶ 50    Our supreme court has interpreted *Morgan* and *Anniston* to hold that "[t]he requirements of due process are met if the decision-making board considers the evidence contained in the report of proceedings before the hearing officer and bases its determination thereon." *Homefinders*, 65 Ill. 2d at 128. Absent statutory provisions to the contrary, there is no due process requirement that "testimony in administrative proceeding[s] be taken before the same officers who have the ultimate decision-making authority." *Id.*

¶ 51    Here, the Act contains no provision requiring the Board to hear the evidence on which its determinations are based. Furthermore, Brooks makes no argument that the transcript of the proceedings does not accurately reflect the evidence presented at the hearing or that the hearing was improperly conducted. In its order, the Board stated that it made findings and rendered its decision after "review of the record, the [ALJ's recommended decision and order], [and] the exceptions and responses thereto." A proper hearing is conducted if the administrative agency determines the facts and makes the ultimate decision based on evidence presented at the hearing, even if the agency reviewed the evidence in the report of proceedings. See *Starkey*, 97 Ill. 2d at 100. Since the Board considered and based its decision on evidence presented at the hearing, the due process requirements in an administrative proceeding were satisfied.

¶ 52    Brooks also contends that section 1200.40(a) of the Code provides for only one ALJ who presides over the hearing and makes findings. Brooks cites the following language:

"The Administrative Law Judge (ALJ) shall have the duty to conduct a fair hearing, to take all necessary action to avoid delay, to maintain order, and to ensure development of a clear and complete record. The ALJ shall have all powers necessary to achieve these ends, including, but not limited to, the discretionary authority to:

* * *

(7) Examine witnesses and direct witnesses to testify; ***" 80 Ill. Adm. Code 1200.40(a)(7).

Brooks points to the phrase "The Administrative Law Judge," noting that the statute does not state "the Administrative Law Judge and some other Administrative Law Judge" or "Administrative Law Judges." She thus argues that findings of credibility can be made only by the ALJ who

conducted the hearing and heard the testimony. As support, she cites *Gilchrist v. Human Rights Commission*, 312 Ill. App. 3d 597 (2000).

¶ 53    *Gilchrist* involved a discrimination case brought pursuant to the Illinois Human Rights Act (Human Rights Act) (775 ILCS 5/8A (West 2022)). In *Gilchrist*, the ALJ who presided over the hearing left the Human Rights Commission (Commission) before issuing a written decision. A second ALJ informed the parties that the matter must be reset for another full hearing because the record presented questions of witness credibility and, according to the statute, she could not issue a written decision in the case as an ALJ who did not preside over the first hearing. *Id*. at 599. The parties filed an agreed motion and stipulation stating that the ALJ could enter a written decision on the matter without having presided over the hearing. *Id*. at 600. A third ALJ subsequently entered a written decision dismissing the complaint with prejudice, which the Commission adopted. *Id*.

¶ 54    On appeal, the court addressed the threshold issue of whether the Commission exceeded its authority in accepting the ALJ's written recommendation when the ALJ had not presided over the hearing. The court noted that an administrative agency is a creature of statute and, as such, "any power or authority claimed by the agency must find its source within the provisions of the statute by which it is created." *Id*. at 601.

¶ 55    Section 8A-102 of the Human Rights Act explicitly provided that findings and the recommended order of a case need not be authored by the presiding hearing officer if three conditions are met: 1) the parties agree that a hearing officer other than the one who presided over the hearing may write the decision; 2) the presiding officer "transmits his or her impression of witness credibility" to the authoring hearing officer; and 3) the presiding officer found no questions of witness credibility presented by the record. *Id*. § 8A-102(1)(4) (West 2022). Interpreting the

plain language of this provision, the court concluded that an ALJ who did not preside over the hearing may enter a written decision in the case only if all three requirements are satisfied. *Gilchrist*, 312 Ill. App. 3d at 602.

¶ 56 The court found that although the parties complied with the first requirement, they did not meet the other two requirements. The ultimate issue in the case was dependent upon credibility determinations. *Id*. at 603. In fact, the authoring ALJ stated that she made credibility determinations in resolving the matter. *Id*. The court referred to section 8A-102 of the Human Rights Act, which "does not confer upon the Commission the authority to allow an ALJ, other than the presiding ALJ, to author the findings and recommended order merely because the parties agree by stipulation to such action." *Id*. at 603. Since the Commission based its decision on the written recommendation of an ALJ who did not preside over the hearing, and witness credibility was at issue, the Commission exceeded its statutory authority in doing so. *Id*. The matter was remanded for another full hearing. *Id*.

¶ 57 Brooks contends that, like the Commission in *Gilchrist*, the Board here exceeded its statutory authority where ALJ Purcell conducted the hearing but made no credibility findings on which ALJ Moy or the Board could rely. Instead, ALJ Moy, who did not preside over the hearing, made credibility findings and issued his recommendation. According to Brooks, due process requires that "the Board's decision be informed by credibility findings of the ALJ who saw the witnesses and presided over the case."

¶ 58 *Gilchrist*, however, is distinguishable. The Human Rights Act applicable in *Gilchrist* explicitly required the ALJ who presided over the hearing to transmit his or her findings of witness credibility to the authoring ALJ. There is no comparable provision in the Act requiring ALJ Purcell to make credibility findings for ALJ Moy, or the Board, to consider.

¶ 59    The Code only imposes upon the ALJ "the duty to conduct a fair hearing, to take all necessary actions to avoid delay, to maintain order, and to ensure development of a clear and complete record." 80 Ill. Admin. Code 1200.40(a). Relevant here, there is no duty obligating the presiding ALJ to make credibility findings for the Board to consider. When construing a statute, we give effect to legislative intent as expressed by the plain language of the statute. *Western Illinois University v. Illinois Educational Labor Relations Board*, 2021 IL 126082, ¶ 33. We will not read into the statute exceptions, conditions, or limitations the legislature did not express. *Id*.

¶ 60    Moreover, even if ALJ Purcell had made credibility findings and transmitted them to ALJ Moy, the Board was not required to accept those findings. The provisions of the Code give the Board the authority to disregard the ALJ's findings and conclusions where appropriate. Section 1200.10 states that the ALJ's "findings of fact and conclusions of law and reasons for those findings and conclusions" are not the final decision of the Board. 80 Ill. Admin. Code 1200.10. In reviewing the ALJ's recommendation, the "Board may adopt all, part or none of the recommended decision and order depending on the extent to which it is consistent with the record and applicable law." 80 Ill. Admin. Code 1200.135. These provisions recognize the Board's ability to make its own findings, including credibility findings, based on transcripts of the proceedings and the record. Where the Board considered the transcripts and the record in rendering its decision, as it did in this case, Brooks received a fair hearing pursuant to the Code. See *Anniston*, 301 U.S. at 357.

¶ 61                                    III. CONCLUSION

¶ 62    For the foregoing reasons, we affirm the Board's decision to dismiss Brooks' unfair labor practice complaint.

¶ 63    Affirmed.